Louis F. ROSANOVA, Plaintiff,

v.

PLAYBOY ENTERPRISES, INC., Defendant.

No. CV475–58.

United States District Court, S. D. Georgia, Savannah Division.

April 6, 1976.

Reginald C. Haupt, Jr., Haupt & Thompson, Savannah, Ga., for plaintiff.

Michael L. Shakman, Devoe, Shadur & Krupp, Chicago, Ill., Walter C. Hartridge, Bouhan, Williams & Levy, Savannah, Ga., Peter R. Kolker, Washington, D. C., for defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.

LAWRENCE, Chief Judge.

### I

The July, 1974, issue of Playboy Magazine contained an article, entitled "Playboy's History of Organized Crime", in which the following paragraph appears:

"Watching Fitzsimmons and Nixon that morning, a California investigator shook his head in dismay. 'I can stand crooks,' he said, 'but it bothers the hell out of me when a guy meets with mobsters and then with the President.' For in the days prior to the flight, in addition to playing golf, Fitzsimmons had attended a number of interesting meetings. At the Mission Hills Country Club and the Ambassador Hotel in Palm Springs, and then at La Costa, he had been joined in long and secret conversation by a host of California mobsters, including Sam Sciortino, Peter Milano, Joe Lamandri and Lloyd Pitzer, and a crew from Chicago that included Accardo, Marshall Caifano, Charles Greller and Lou Rosanova."

The paragraph appeared in the last segment of a twelve-part series. The controversial excerpt is in that portion of the July, 1974, article dealing with the relationship between various members of "organized crime", the Teamsters Union, its head (Frank Fitzsimmons) and President Richard M. Nixon. In none of the other articles in the series was the name of Mr. Rosanova mentioned.

At the time of the publication Louis F. Rosanova was Executive-Director of the Savannah Inn and Country Club which is owned by the Central States Southeast Southwest Pension Fund of the International Brotherhood of Teamsters. Plaintiff has brought this diversity action against Playboy Enterprises, Inc., alleging that calling him a "mobster" is a false, malicious and defamatory libel *per se* under Georgia law.[1]

Extensive discovery by both sides has preceded Playboy's motion for summary judgment. The defendant contends that no genuine issue of fact exists. It says that Mr. Rosanova occupies the status of a public figure because of his "underworld contacts and involvements" and that the record indisputably shows that the article was published without knowledge of any alleged falsity, and further that there was no reckless disregard for the truth on its part.

### II

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, the Supreme Court entered the field of state libel law as it bears on First Amendment rights. It held that damages cannot be awarded to a public official for defamatory falsehood relating to official conduct in the absence of proof of "actual malice" or reckless disregard of whether the statement was true or false. Three years later in 1970 the Court in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 extended the constitutional protection afforded by *Sullivan* to a publisher in libel actions brought by "public officials" to "a public figure" upon a showing of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." See 388 U.S. at 155, 87 S.Ct. at 1991, 18 L.Ed.2d at 1111.

The following year in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29

---

1. "Mobster" is defined in *World Book Encyclopedia Dictionary* (1964) as "a chronic lawbreaker, especially a person who specializes in crimes of violence; gangster". The definition in *Webster's Third New International Dictionary* is "a member of a criminal gang". In current parlance, the word "mob" has acquired a new meaning and connotation. The traditional definition of the term has been extended to "a criminal set or organization (as of pickpockets or gangsters)." See *Webster's Dictionary.*

L.Ed.2d 296, the highest Court affirmed a ruling by the Third Circuit to the effect that the *Sullivan* standard was applicable where the plaintiff was not a public figure and that such status was not to be accorded decisive significance. The plurality opinion by Mr. Justice Brennan in *Rosenbloom* would disregard any distinction between a public official and a public figure, on the one hand, and a private person on the other, if the defamatory statement concerned a matter of general or public interest. *Rosenbloom*, at 43, 91 S.Ct. at 1819, 29 L.Ed.2d at 311. That theory was jettisoned in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). There the Court wrestled with the standard of liability where a *private* citizen is defamed by a libelous publication. "[U]nder the plurality opinion" [in *Rosenbloom*], said Mr. Justice Powell, "a private citizen involuntarily associated with a matter of general interest has no recourse for injury to his reputation unless he can satisfy the demanding requirements of the *New York Times* test." *Gertz,* 418 U.S. at 337, 94 S.Ct. at 3006, 41 L.Ed.2d at 804. A majority of the Court concluded that such an "approach would lead to unpredictable results and uncertain expectations, and it could render our duty to supervise the lower courts unmanageable." "Because an *ad hoc* resolution of the competing interests at stake in each particular case is not feasible, we must lay down broad rules of general application," said Justice Powell. *Gertz,* 418 at U.S. 343–344, 94 S.Ct. at 3009, 41 L.Ed.2d at 807.

The *Gertz* court extended to "public figures" the *Sullivan* doctrine that a publisher is liable "only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." 418 U.S. at 342, 94 S.Ct. at 3008, 41 L.Ed.2d at 807. Subjective awareness of probable falseness amounts to the same thing. *Gertz,* at 334, n.6, 94 S.Ct. at 3004, 41 L.Ed.2d at 802. However, in the case of private individuals a less demanding standard was adopted by the Court. As long as a state does not impose liability without fault, it may define for itself the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. Any rule of strict liability that would amount to a guaranty of accuracy of factual assertions is unacceptable. *Gertz,* at 347, 94 S.Ct. at 3010, 41 L.Ed.2d at 809.[2] Thus, a negligence standard is established where defamation of a private individual by publication is involved.[3]

### III

How and where do we draw a line between public figures and private individuals? They are nebulous concepts. Defining public figures is much like trying to nail a jellyfish to the wall. *Gertz* tells us little more than that a private individual is one who "has not accepted public office nor assumed an influential role in ordering society", that is to say, occupies a role of "especial prominence in the affairs of society" or "thrust themselves to the forefront of par-

---

**2.** This is in essence what Justices Harlan and Marshall had contended for in *Rosenbloom*, 403 U.S. at 64 and 86, 91 S.Ct. at 1829, 1840, 29 L.Ed.2d at 323, 336. The *Gertz* Court also adopted the Harlan-Marshall concept of restricting defamation awards to actual damages. See case note on *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328; 9 *Georgia Law Review* (1975), 972, n.31.

**3.** The Tentative Draft of the Restatement of Torts rationalizes the *Gertz* ruling in this proposed new section:
"§ 580B. *Defamation of Private Person.*
One who publishes a false and defamatory communication concerning a private person,

or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
(a) knows that the statement is false and that it defames the other.
(b) acts in reckless disregard of these matters, or
(c) acts negligently in failing to ascertain them."
See John W. Wade, "Defamation, the First Amendment and the Torts Restatement", *The Forum* (A.B.A.), XI (Fall, 1975), 3, 9.

ticular public controversies in order to influence the resolution of the issues involved." In either event, such persons "invite attention and comment". 418 U.S. at 351, 345, 94 S.Ct. at 3012, 3009, 41 L.Ed.2d at 811, 808.[4]

In its recent decision in *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154, the Supreme Court held that the plaintiff (Mrs. Firestone) was not a "public figure" since she had not assumed any role of "especial prominence in the affairs of society, other than perhaps Palm Beach society." The fact that she held press conferences during a much publicized divorce proceeding was insufficient to make her such a figure for the purpose of determining the constitutional protection afforded *Time's* report of the factual and legal basis for the divorce.

■ The term "public figures" has been defined as "those persons" who, though not public officials, are "involved in issues in which the public has a justified and important interest." Such figures are, of course, numerous and "include artists, athletes, business people, dilettantes, anyone who is famous or infamous because of who he is or what he has done." *Cepeda v. Cowles Magazines and Broadcasting, Inc.*, 392 F.2d 417, 419 (9th Cir.), cert. den. 393 U.S. 840, 89 S.Ct. 117, 21 L.Ed.2d 110.

■ Whether a matter is of public or general concern is a question of law for the court. *Walker v. Colorado Springs Sun, Inc.* (Sup.Ct.Colo.), 538 P.2d 450, 459. "[I]t is for the trial judge in the first instance to determine whether the proofs show [plaintiff] to be a 'public official.' " *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597, 606. Similarly, while "the issue of whether a plaintiff in a defamation action is a public figure poses a mixed question of law and fact, it is nevertheless one for the Court, not the jury, to determine." *Hotchner v. Castillo-Puche*, 404 F.Supp. 1041, 1045 (S.D., N.Y.).

Viewed in the crepuscule of judicial definement, was Mr. Rosanova a "public figure" because of the alleged involvements and contacts that gave rise to the defamation?

## IV

■ Defendant contends that Mr. Rosanova is a public figure for the purposes of the article for three reasons: (1) Extensive contacts over a period of years with underworld figures and criminal prosecutions; (2) Substantial and sustained publicity in relation to his alleged underworld ties; (3) Long-standing relationship with Teamsters President Frank Fitzsimmons and involvement in Teamsters' business.

Mr. Rosanova acknowledges that in 1963 he was identified as a member of organized crime in a chart prepared by the staff at a United States Senate Committee investigating that subject. It referred to him as a member of the "Chicago-Italian Organization". Plaintiff admits that he was socially acquainted with many of the persons listed on the chart and on a good-friend basis with others. His contact in many instances grew out of his business connection with two golf clubs in the Chicago area which defendant contends were recognized as gathering places for "underworld" figures.

Mr. Rosanova has been the subject of governmental investigations and criminal prosecutions. He has never been convicted of any crime, however, He conceded in his deposition that "rap sheets" are kept on him by FBI as well as by the States of Illinois, California, Florida and Georgia. In 1972 his alleged activities resulted in an article in the *Savannah Morning News*, headlined "Governor says Probe Includes Savannah Inn", stating that "Gov. Jimmy Carter Thursday singled out the Savannah Inn and Country Club as one of the 30 or 40 businesses in the State under investigation for possible links with organized crime". Subsequently, an investigation was

---

4. For extensive Comment on the subject of the *Sullivan-Butts-Gertz* trilogy, see Neil Merts,

"Constitutional Limitations on Libel Actions", 28 *Baylor Law Review* (Winter, 1976), 79–108.

launched by the Georgia Alcohol and Tobacco Tax Unit which resulted in the suspension of the resort's liquor license. In the same year (1972) plaintiff was indicted for mail fraud in the federal court in Chicago. He was acquitted of the charge.

Defendant presented an extensive resume of the publicity Mr. Rosanova has received in press, periodicals and books over a period of ten years before the Playboy article came out. There are over forty such articles and references. They predominantly relate to alleged underworld contacts and involvements. Articles concerning plaintiff's activities have appeared in newspapers in Chicago, Miami, Atlanta, New York and Los Angeles. Included among his alleged activities is his long-standing and close relationship with the Teamsters Union.

The Playboy article in which Mr. Rosanova was mentioned focused on the Teamsters Union and its relationship to former President Nixon. Plaintiff has received considerable publicity as the Executive Director of the Savannah Inn and Country Club, which, as stated, is owned by a Teamsters Pension Trust. Mr. Rosanova testified on deposition that he has known Mr. Fitzsimmons for approximately thirty years and characterizes him as "an old friend of mine". He further testified that he saw him at least twice in the period immediately preceding the La Costa meeting referred to in the Playboy article. On one of those occasions he lunched with Mr. Fitzsimmons.

In opposition to Playboy's motion, plaintiff argues that he is not a public figure because he does not have sufficient access to the media to contradict the statements by defendant and because he has not voluntarily thrust himself into the vortex of any public issue. He contends that "as a matter of policy" a private individual should not be treated as a public figure merely because other publishers have printed unsupported allegations concerning him. Rosanova denies that any secret meetings ever occurred between him and Frank Fitzsimmons. He acknowledges having publicly met with the Teamsters' President in California in 1973.

The evidence reflects that Mr. Rosanova voluntarily engaged in a course that was bound to invite attention and comment. His status as a "public figure" for the purposes of this case did not result merely from the unfavorable publicity concerning himself. The latter came about from his voluntary contacts and involvements related to the subject matter of the article.

## V

Under Georgia law, a libel is "a false and malicious defamation of another, expressed in print, or writing, or pictures, or signs, tending to injure the reputation of an individual, and exposing him to public hatred, contempt, or ridicule. . . ." Ga.Code Ann. §§ 105–701, 703. Libel *per se* is a publication charging that one is guilty of a crime, dishonesty or immorality. To be actionable the statement must be both false and malicious. *Mathews v. Atlanta Newspapers, Inc.,* 116 Ga.App. 337, 157 S.E.2d 300. Malice is inferred from the nature of the defamation. The want of express or implied malice goes only to mitigation of damages save in the case of privileged communications. Ga.Code Ann. § 105–706. The publication of libelous matter imposes on the publisher the burden of rebutting the accompanying presumption of malice. *Montgomery v. Pacific & Southern Company, Inc. et al.,* 131 Ga.App. 712, 717, 206 S.E.2d 631. No proof of special damage is necessary in the case of libel *per se.* General damages are recoverable. *Weatherholt v. Howard,* 143 Ga. 41, 42, 84 S.E. 119. Punitive damages are awardable in a case where supporting facts exist independent of the presumption of malice arising by the mere fact of defamation. *Pugh v. McCarty,* 40 Ga. 444.

One of the most significant developments in constitutional law in the past decade has been the Supreme Court's involvement in State libel law in its attempt to accommodate First Amendment guarantees to an individual's right to vindicate his reputation and good name in the civil courts.

■ The federalization of state law and the resulting restriction on recovery for libel requires major adjustments in the law of defamation as codified and interpreted in Georgia in relation to press, periodicals and broadcasting. Common law libel wears a very different aspect in the light of latter-day constitutional doctrine. Defamed public officials and public figures can recover only upon a showing of malice, express or implied. Private individuals cannot recover unless the defamation is the result of fault or negligence on the part of the publisher. Recovery is restricted to actual or special damages. See, however, *Carson v. Allied News Company,* 529 F.2d 206, 214 (7th Cir.) where it was said of the holding in *Gertz* in that regard: "The fairly clear implication is that where actual malice as defined in New York Times is shown, presumed and punitive damages are recoverable if the applicable state law permits such damages, and hence special damages need not be shown."

I have determined that, for the purposes of the Playboy article, plaintiff was a public figure within the meaning of *Gertz* and not a private individual. I proceed to the next step in the media-defamation formulae. Was there actual malice on the part of the defendant? Does the record at this point raise a question as to knowledge of falsity or reckless disregard of whether the statement that Rosanova and others were "mobsters" was true or not?

■ At the present stage, it is not a question of the *truth* of the alleged falsehood. The statement may be false but it is still not actionable unless it was made by the publisher in reckless disregard for the truth. "Even if the story is indeed false, [plaintiff] must meet that standard." *Mistrot v. True Detective Publishing Corporation,* 467 F.2d 1229 at 124 (5 Cir.).[5] The publisher's protection extends to reasonable inferences drawn from the spectrum of information concerning one alleged to have engaged in underworld activities even though he has never been convicted.

In *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 the Supreme Court "equated reckless disregard of the truth with subjective awareness of probable falsity; "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." See *Gertz,* 418 U.S. at 334, 94 S.Ct. at 3004, 41 L.Ed.2d at 802. According to *Sullivan,* the constitutional standard of proof of actual malice is that of "convincing clarity". 376 U.S. at 285–86, 84 S.Ct. at 728–729, 11 L.Ed.2d at 709–710.

With these demanding standards in mind, I turn to the defendant's motion for summary judgment.

## VI

The series of articles in Playboy was written by Richard Hammer, a free-lance writer. He had not previously contributed to the magazine. Hammer was for many years a reporter for the *New York Times* and had won approximately ten awards from that publication. He received an Academy Award for a movie entitled "Interviews with My Lai Veterans". He is the author of five books.

Mr. Hammer testified that in preparing the articles he followed his independent judgment as to content and phrasing. Playboy provided newspaper clippings and reference materials requested by him and checked his articles for accuracy before going to press.

He further testified that he obtained information concerning Rosanova from eight different newspaper sources in which the latter's name appeared. The articles deal principally with alleged long and secret meetings between underworld figures and Frank Fitzsimmons, President of Team-

---

**5.** The Fifth Circuit also said: "[W]e do not read Rosenbloom v. Metromedia, Inc. as limiting the First Amendment to 'news accounts' that are purely informative and that are not prompted in the least by any desire to increase circulation by publishing news stories in a style calculated to amuse or astonish the audience."

sters, at Palm Springs and La Costa, California in 1973. They allegedly preceded Mr. Fitzsimmons' flight to Washington with President Nixon on the presidential plane. (Mr. Rosanova vigorously denies that he attended any secret meetings).

The eight newspaper articles referred to are:

1) Los Angeles Times, May 31, 1973, page 1, written by Jack Nelson and Bill Hazlett;

2) Los Angeles Times, June 1, 1973, page 1, written by Bill Hazlett;

3) Chicago Daily News, October 14, 1972, page 1, written by Edmund J. Rooney and Phillip J. O'Connor;

4) Chicago Sun Times, June 3, 1973, page 1, written by Jack Nelson (and bearing the notice "Special from Los Angeles Times");

5) Chicago Daily News, December 26, 1972, page 3, column 1, written by Mike Royko;

6) Los Angeles Times, page 1, written by Mike Royko (and bearing the notice "Exclusive to the Times from the Chicago Daily News");

7) Chicago Daily News, February 15, 1972, page 1, written by Ed Kandlik;

8) Chicago Sun Times, November 10, 1972, page 68, column 1, written by Dennis D. Fisher.

The foregoing articles were sent to Hammer by Barbara Nellis, a research editor for Playboy. She in turn had obtained them from Rosemary Baehr, a reference librarian employed by the magazine. After writing the article, Hammer submitted it to Playboy for editing. Karen Stevens, a copy researcher, checked it for accuracy. On deposition, she testified that she relied upon articles from the New York Times and Nation magazine and that she called the author to check various aspects. In regard to the Rosanova reference she was told by

Hammer that he had also obtained the information from a government source. He identified that source as a former employee of the Federal Drug Enforcement Administration, Jack Kelly. Hammer also produced his contemporaneous notes of his conversation with Mr. Kelly.

In the latter's deposition, he denied discussing Rosanova with Mr. Hammer. Kelly acknowledged meeting with the author.

 One of the major points urged by plaintiff's counsel in opposing defendant's motion is that the discrepancy between this testimony of Hammer and Kelly creates an issue of fact as to mutual malice on the part of the publisher. To my mind, isolated factual issues as to investigation are not controlling in determining whether there was reckless reporting by a periodical. That issue must be examined in the light of the total information developed and used by the publisher and author. Mr. Kelly's testimony is only a detail in the panoramic whole. In any event, he does not deny the accuracy of Hammer's statements concerning Rosanova. Kelly merely testified that Hammer did not obtain the information from *him*. The author relied on eight other news articles which he considered reliable and which contain virtually everything said concerning Mr. Rosanova and the alleged Fitzsimmons-Teamsters-Nixon Connection. The showing demonstrates that the author had independent reasons to believe what he wrote.[6] The conflict in the testimony of Hammer and Kelly is insufficient to raise a controlling issue of fact as to malice and knowledge of falsity or reckless disregard for truth.

There is no evidence that Playboy employees who were responsible for publishing the article had awareness of any falsity or reason to believe the materials might be erroneous. Ms. Baehr, the librarian, testified that she simply clipped newspaper articles and gave them to Ms. Nellis. The

6. In *New York Times v. Connor*, 365 F.2d 567, 576, the Fifth Circuit said in this connection, "While verification of the facts remains an important reporting standard, a reporter, without a 'high degree of awareness of their probable falsity,' may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution by a public official."

latter merely forwarded them to Mr. Hammer.

Ms. Stevens, the copy checker, testified that she verified the paragraph in issue with Mr. Hammer and further by reference to an article appearing in the *New York Times* on April 29, 1973 and one from *Nation* dated September 3, 1973. The record reflects that both articles contain essentially the same matter contained in the paragraph in controversy. Karen Stevens testified that she regarded both publications as reliable sources. She considered Mr. Hammer to be a trustworthy writer.[7]

In *Mistrot v. True Detective Publishing Corporation, supra,* 467 F.2d 122, 124 the Fifth Circuit affirmed the trial court in granting summary judgment to the publisher. As in the present case, the article was written by a free-lance author. The Court said:

"Appellee [the magazine] required the author to submit a list of the sources he had used in researching the story. The author listed specified official court records, other official records, newspaper accounts, and interviews with law enforcement personnel and with the murderer's cousin. Even if appellee's reliance on the statement of sources was negligent, appellant's case is not strengthened. '[N]egligence . . . is constitutionally insufficient to show the recklessness that is required for a finding of actual malice.' *New York Times Co. v. Sullivan, supra,* 376 U.S. at 288, 84 S.Ct. at 730, 11 L.Ed.2d at 711."

In *Mistrot* the magazine made no independent effort to verify the author's statements. Here Playboy collected authorities confirming the basic information used in the article with respect to the Rosanova-Fitzsimmons meeting in California.

Plaintiff contends that because Playboy did not contact Mr. Rosanova or Mr. Fitzsimmons and did not check original police and government records, the magazine acted with reckless disregard for the truth. Plaintiff characterizes defendant's attempts at verification as "superficial and illusory." Counsel also argues that Playboy violated its own standards of checking accuracy of material. To support this contention, they rely on a statement by Mr. Kretchmer, Playboy's editorial director, to the effect that the "best way" to verify a statement is to check original records. However, Kretchmer did not say that this method was the magazine's policy.

Mr. William Klein who is Playboy's General Counsel testified that it was his understanding that the pre-publication staff is required to check statements "to a point where they are satisfied they are true." Ms. Stevens relied only upon the author and on previous news articles in checking the accuracy of the controversial paragraph. However, she states that she believed all of her sources to be reputable. She had used *Nation* before in checking the accuracy of articles.

The record before the Court in the present case does not support the contention that Playboy violated its own policies in verifying the content of the article as related to plaintiff. Failure to check original government or police records does not amount to recklessness where other and reliable sources were utilized by the publisher. "Failure to investigate does not in itself establish bad faith." *St. Amant, supra,* 390 U.S. at 733, 80 S.Ct. at 1326, 20 L.Ed.2d at 268.

## VII

Courts frequently dispose of the question of malice on the defendant's motion for summary judgment. I did so in *Bon Air Hotel, Inc. v. Time, Inc.,* 295 F.Supp. 704. In affirming that ruling the Court of Appeals said: "Thus it is clear that, where a publication is protected by the *New York Times* immunity rule, summary judgment, rather than trial on the merits, is a proper

---

7. See *Vandenburg v. Newsweek, Inc.,* 507 F.2d 1024, 1027 (5th Cir.) where it was noted that the writer of the defamatory article "had corroborative stories from sources he believed reliable" and that his "faith" therein was not "unreasonable".

vehicle for affording constitutional protection in the proper case." 426 F.2d 858 at 864–65. It has been said that "because of the importance of free speech, summary judgment *is* the 'rule,' and not the exception, in defamation cases." *Guitar v. Westinghouse Electric Corporation,* 396 F.Supp. 1042, 1053 (S.D., N.Y.).[8]

"Clear and convincing" evidence of malice or reckless disregard for truth is lacking here. Plaintiff has not shown, indeed the contrary appears, that either the magazine staff or the free-lance writer, Mr. Hammer, knew or believed to be false the material relied on or the statements concerning Mr. Rosanova. Nor is there a showing that Playboy entertained serious doubt as to the truth of what was said in the article.

Defendant's motion for summary judgment must be and is granted.

---

8. See also in this connection *Time, Inc. v. McLaney, supra,* 406 F.2d at 571–72 (5th Cir.); *Dacey v. The Florida Bar, Inc.,* 427 F.2d 1292, 1296 (5th Cir.); *Cardillo v. Doubleday & Co., Inc. et al.,* 518 F.2d 638 (2nd Cir.); *McFarland v. Hearst Corporation,* 332 F.Supp. 746, 750 (D., Md.).; 6 *Moore's Federal Practice* § 56.-17[40], p. 56–928, n.8.