Gabrielle BREDA, Plaintiff,

v.

WOLF CAMERA, INC. Defendants.

No. 4:97CV366.

United States District Court,
S.D. Georgia,
Savannah Division.

June 25, 2001.

Charles R. Ashman, Ashman, Lasky & Cooper, Savannah, GA, Ralph E. Lamar, IV, Doylestown, PA, for Plaintiff.

John F. Wymer, III, Jona J. Miller, King & Spalding, Atlanta, GA, Scott M. Porter, Powell, Goldstein, Frazer & Murphy, LLP, Atlanta, GA, John E. Bumgartner, Whelchel, Brown, Readdick & Bumgartner, Brunswick, GA, for Defendants.

### *ORDER*

EDENFIELD, District Judge.

## I. *INTRODUCTION*

Plaintiff Gabrielle Breda brought this action against Wolf Camera, Inc. (WCI), her former employer, after resigning from her position as a sales associate at its Savannah, Georgia, store. She alleged she was subjected to a hostile work environment based on sex and disability, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, and Title I of the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101.

This Court granted WCI's motion for summary judgment on all of her claims. Doc. ## 120–21. The Eleventh Circuit affirmed the dismissal of her "disability harassment" claim, *Breda v. Wolf Camera & Video,* 222 F.3d 886, 888 n. 1 (11th Cir.2000), but reversed and remanded on her sex-based, hostile work environment claim. *Id.* at 890–91.

On remand, WCI renews, over Breda's opposition, its summary judgment motion. Doc. # 132. The parties have extensively briefed their respective positions. *See* doc. # 137 (Breda's 55–page response brief); # 141 (WCI's Reply Brief); # 143 (Breda's Reply brief); # 144 (WCI's Supplemental Reply brief); # 146 (Breda's response to same); # 148 (Breda's Supplemental Brief); ## 149–150.

## II. *BACKGROUND*

As the Eleventh Circuit summarized,

[WCI] is an Atlanta-based corporation that sells cameras, film, and camera accessories, and provides photo-finishing and imaging services. [It hired Breda on 10/10/95] as a sales associate at [its Savannah, Georgia store]. The ... store is open every day during the same hours as the shopping mall. [Sharpley, the] store manager directly supervises all employees, and [Audie Baez, the] district manager visits the store once every five or six weeks to oversee the store manager.

The [store] employees ... work in either sales or the photo-processing lab. After she was hired, [Breda] became one

of three full-time sales associates at the store, and, like the other sales associates, she worked approximately 40 hours per week with 2 days off each week.

[Breda] alleges she was subjected to sexual harassment throughout her employment with [WCI]. On [12/20/96, Breda] resigned from her employment with [WCI] because of this alleged harassment. She subsequently instituted this action, claiming she was subjected to a hostile work environment in violation of Title VII. [This] [C]ourt granted summary judgment to [WCI] on [Breda's] claim after concluding Breda had not established a prima facie case of hostile work environment sexual harassment because she had not demonstrated a basis for holding [WCI] liable for the harassment.

*Breda*, 222 F.3d at 888; doc. ## 120–21.

Breda alleges that, from her first day on the job onward, co-workers Robert Morris and Darryl Reynolds subjected her to a continuous pattern of sexual harassment. *Id.* She says she repeatedly complained of Morris' conduct to Sharpley, but Sharpley disputes the number and timing of her complaints. Sharpley also contends that Breda's "complaints reflected not sexual harassment, but only general animosity between co-workers." *Id.*

This Court noted WCI's policy against sexual harassment, that Breda had read it, and that it required her to contact WCI's Personnel Department if Sharpley failed to "immediately resolve" harassment complaints. Doc. # 120 at 2–3. Because Breda failed to do so, or even complain to an otherwise accessible district manager (Baez), *id.* at 4–5, she failed to provide WCI with adequate notice and thus give it a reasonable opportunity to resolve the problem. *Id.* at 5–8.

The Court thus granted WCI summary judgment. *Id.* at 11. But under WCI's policy, the Eleventh Circuit concluded, it was sufficient for Breda to complain to her store manager, Sharpley. 222 F.3d at 889. It wasn't enough that WCI had constructed a backup mechanism for correcting harassment to compensate for any weak links, and that Breda failed to exploit it. *See* doc. # 120 at 6 (this Court's application of Seventh Circuit precedent to the undisputed fact that Breda had failed to complain to Baez despite repeated opportunities to do so).

Rather, the Eleventh Circuit reasoned, once a company establishes a clear complaint policy and its employees comply, they "need not be concerned whether they pursued their complaints far enough up the company ladder." *Breda*, 222 F.3d at 890. It therefore reversed this Court, *id.*, but found

> the record insufficient to determine whether Sharpley was adequately informed that [Breda] believed she was the victim of sexual harassment. There are factual disputes as to the number and timing of complaints [she] made to Sharpley. In addition, there is disagreement over whether [Breda's] complaints specifically indicated she was complaining of sexual harassment rather than general workplace animosity between co-workers. Accordingly, we remand the hostile work environment sexual harassment claim.

222 F.3d at 890.

Subsumed within the above-excerpted discussion, of course, is whether what Breda complained of constituted a hostile sexual environment in the first place. In other words, she may establish that she sufficiently complained to Sharpley of misbehavior, but whether that misbehavior amounts to a hostile sexual environment is a matter for this Court to decide under Rule 56. *See Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1246 (11th Cir. 2001) ("We recognize that claims of em-

ployment discrimination ... present fact-intensive issues. However ... motions for summary judgment or judgment as a matter of law are appropriate to police the baseline for hostile environment claims") (quotes and cite omitted).

## III. ANALYSIS [1]

### A. Sexual Harassment

One must first understand what sexual harassment is in order to determine whether Breda communicated the existence of a "sexually hostile environment" to Sharpley. Sexual harassment is actionable under Title VII only if it is "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 1509, 149 L.Ed.2d 509 (2001) (quotes and cite omitted); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999) (en banc), *cert. denied*, 529 U.S. 1068, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000).

██ Breda thus must show harassment of such magnitude that it altered her work environment. *E.E.O.C. v. R & R Ventures*, 244 F.3d 334, 341 (4th Cir.2001) (The inquiry is not whether work has been impaired, but whether working conditions have been discriminatorily altered).

Part of that showing obviously is subjective—what Breda perceived. But it also must meet an objective standard. *See Gregory v. Daly*, 243 F.3d 687, 691–92 (2nd Cir.2001) (Harms suffered in the workplace are cognizable under Title VII, even when they are not the result of tangible employment actions, if they arise from conduct that: (1) is *objectively* severe or pervasive; (2) the employee *subjectively* perceives as hostile or abusive; and (3) creates such an environment because of the employee's sex or other characteristic protected by Title VII); *accord Leibovitz v. New York City Transit Authority*, 252 F.3d 179, 188 (2nd Cir.20001).

██ Courts thus ask, "Would a reasonable person in plaintiff's position find the harassment severe and pervasive?" *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F.Supp.2d 1237, 1250 (M.D.Ala.2001) (*Dinkins I*) (citing *Johnson v. Booker T. Washington Broadcasting Service*, 234 F.3d 501, 509 (11th Cir.2000), and *Mendoza*, 195 F.3d at 1246); *see also Fitzgerald v. Henderson*, 251 F.3d 345, 358 (2nd Cir. 2001). To answer that question, courts

> consider the frequency of the conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's job performance.

*Dinkins I*, 133 F.Supp.2d at 1250 (quoting *Mendoza*, 195 F.3d at 1246); *see also Weston v. Commonwealth*, 251 F.3d 420, 425–26 (3rd Cir.2001); *R & R Ventures*, 244 F.3d at 339. A single incident typically will not be enough. *Breeden*, 532 U.S. at ——, 121 S.Ct. at 1510.

██ While other Title VII claims may require courts to scrutinize discrete harms such as a hiring or discharge, a hostile sexual work environment-based claim requires courts to analyze a workplace environment as a whole to discover whether it is abusive. *Raniola v. Bratton*, 243 F.3d 610, 617 (2nd Cir.2001); *R & R Ventures*, 244 F.3d at 340 ("The real social impact of

---

1. This Court applies the summary judgment principles explained in *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742–43 (11th Cir. 1996) and *Cohen v. United American Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir.1996)

Unrebutted, evidentially supported Fact Statements are deemed admitted under S.D.Ga. Local Rule 56.1 and *Dunlap v. Transamerica Occidental Life Ins. Co.*, 858 F.2d 629, 632 (11th Cir.1988).

workplace behavior often depends on a constellation of surrounding circumstances....")

■ Here Breda need not show that each hostile act was sexual in nature. *Raniola*, 243 F.3d at 617; *id.* at 619–20 (workplace sabotage can support a hostile environment claim). But if sexual conduct is placed in issue, it must not be "merely tinged with offensive connotations, but actually [be shown to have] actually constituted discrimination because of sex." *Id.* at 621 (quotes and cite omitted); *Weston*, 251 F.3d 420, 427 (Mere utterance of an epithet, joke, or inappropriate taunt in the workplace that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability).

WCI correctly notes that, of the two types of sexual harassment—quid pro quo and hostile environment[2]—Breda complains of only the latter. Doc. # 133 at 4. But the abuse Breda allegedly suffered, WCI argues, simply does not rise to actionable sexual harassment. Doc. # 133 at 4–17.

More specifically, WCI points to conduct found not actionable in *Mendoza*, 195 F.3d at 1247–53, and *Gupta v. Florida Bd. of Regents*, 212 F.3d 571 (11th Cir.2000), and argues that, by comparison, the conduct here is legally insufficient to support a sexual harassment claim. Doc. # 132 at 1–2; # 133 at 4–17. Again, this issue can moot the notice (to Sharpley) issue—if no sexual harassment occurred, then there was no sexually hostile environment and, in turn, it simply does not matter how often Breda reported to Sharpley.

**2.** "Generally, sexual harassment comes in two forms, harassment that does not result in a tangible employment action (traditionally referred to as 'hostile work environment' harassment), and harassment that does result

## B. Prima Facie Case

Sexual harassment must form part of Breda's prima facie case. She thus must show that:

(1) she is a member of a protected group; (2) she was the subject of unwelcome sexual harassment; (3) the harassment occurred because of her sex; and (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment.

*Breda*, 222 F.3d at 889 n. 3. For the purposes of summary judgment, WCI concedes elements (1)-(2). Doc. # 133 at 4. It insists, however, that whatever harassment she suffered was not because of her sex and, in any event, was no where near "*sufficiently severe* or pervasive to alter the terms and conditions of her employment." *Breda*, 222 F.3d at 889 n. 3 (emphasis added). ·

## C. "Sufficiently Severe"

The question of what is "sufficiently severe" sexual harassment is complicated because:

(a) courts routinely remind plaintiffs that "Title VII is not a federal civility code," *Mendoza*, 195 F.3d at 1245; *see also Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) ("Title VII does not attempt to purge the workplace of vulgarity"); *R & R Ventures*, 244 F.3d at 339 ("Boorish behavior may exist apart from any propensity to discriminate");

(b) the modern notion of acceptable behavior—as corroded by instant-gratification driven, cultural influences (*e.g.* lewd music, videos, and computer games, "perversity-programming" broadcast

in a tangible employment action (traditionally referred to as 'quid pro quo' harassment)." *Johnson*, 234 F.3d at 508, *see also Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001).

standards, White House "internal affairs" and perjurious coverups of same, etc.) has been coarsening over time; therefore,

(c) what courts implicitly ask the "Title VII victim" to tolerate as mere "boorish behavior" or "workplace vulgarity" must, once placed in the contemporary context, account for any "Slouch Toward Gomorrah"[3] societal norms might take.

■ At the same time, this entire area of law is enervated by vague, almost circular standards: Title "VII affords employees the right to work in an environment free from *discriminatory* intimidation, ridicule and insult." *R & R Ventures,* 244 F.3d at 339 (emphasis added; quotes and cite omitted). Hence, intimidation, ridicule and insult can be actionable if they reach a "discriminatory" (*i.e.,* "sufficiently severe") level. But that's just another way of saying that if behavior offends the particular judge asked to apply *Hipp*'s "baseline" standard (*i.e.,* whether, under F.R.Civ.P. 50/56 it should go to a jury), then it must be "discriminatory."

And that, in turn, simply beckons the core question: just what is "sufficiently severe?" The answer forms the keystone to a hostile sexual environment case:

> [It] is the element that tests the mettle of most sexual harassment claims. Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 2283–84, 141 L.Ed.2d 662 (1998). This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace— such as male-on-male horseplay or intersexual flirtation—for discriminatory 'conditions of employment.' " *Oncale v.*

*Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998).

*Gupta,* 212 F.3d at 583.

As turgid opinions like *Mendoza* show, courts decide what is "sufficiently severe" by resorting to "crudity comparables." That is, judges must compare the crudity and "lewdity" found in one case with that deemed sufficient to survive a Rule 50 or 56 motion in another.

Thus, not only must patterns or (in some cases) mere spasms of offensive behavior be judicially dissected and quantified, but also the "surrounding circumstances" in which they occurred. *See R & R Ventures,* 244 F.3d at 340 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances....."); *accord Leibovitz,* 252 F.3d 179, 188. Often this compels judges to painstakingly recite and analyze the "real" meaning of every last passing glance, raised eyebrow, comment, double entendre, grunt, sniff, etc. even if—especially where the victim has maintained a "journal" or "diary"—such occurred over long periods of time.

To that end, some judges simply recount a "parade of horribles," then announce that the line has been crossed. *See Dinkins I,* 133 F.Supp.2d at 1250 (supervisor "constantly touched [victim's] breasts and buttocks. He told [her] that 'he always wanted a beautiful black woman'......"); *Dinkins v. Charoen Pokphand USA, Inc.,* 133 F.Supp.2d 1254, 1263 (M.D.Ala.2001) (*Dinkins II* ) ("Here, Plaintiffs were subjected to a continual, sustained barrage of unwelcome comments and touchings, including requests for sex and unwelcome grabbing of their hips, buttocks, breasts, and genitalia. The court finds that a reasonable juror could agree that they la-

---

**3.** *See* R.H.Bork, *Slouching Toward Gomorrah* (Regan Books 1996).

bored in a hostile, abusive, and oppressive work environment").

Consulting the case law *could* lead one to think that only cases involving sexual touching will cross the actionability line. *See Johnson*, 234 F.3d at 509 (finding actionable sexual harassment where, *inter alia*, supervisor gave the complainant "unwanted massages, standing so close to [her] that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts. . . .").

■ But in fact, sexual touching, grabbing, fondling (etc.) is simply not necessary. *See R&R Ventures*, 244 F.3d at 338–39 (Restaurant manager's alleged actions toward female employees, if proven, were because of sex, as required for prima facie claim of hostile environment sexual harassment, even if manager was sometimes abusive to male employees, where manager allegedly directed sexually pointed comments exclusively to young women who worked for him, closely examined female employees' bodies, inquired about their pant size, and made references to size of female employee's buttocks and breasts).

### D. "Jellyfish"

As the case law has grown to show, determining the intensity/quantity of sexual gesturing, touching, bantering and innuendo that it takes to render a work environment sexually hostile is now no less difficult than "trying to nail a jellyfish to the wall." *Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440, 443 (S.D.Ga. 1976), *aff'd*, 580 F.2d 859 (5th Cir.1978).

Worse, current methodology invites arbitrary results. "Sensitive" judges might find a case laden with sexually crude jokes and behavior sufficient to send the case to a jury, if not support a jury's "hostile environment" determination. Whether a judicial schism forms within an appellate opinion can often be traced to whether a particular judge with a different sensitivity to "incivility" or "vulgarity" sits on a panel. *See Hocevar v. Purdue Frederick Co.*, 223 F.3d 721 724 n. 3 (8th Cir.2000) (referencing court's regrettable need to "explicitly recite the use of foul and offensive language," then concluding: "Women in any work environment will be totally bewildered by the suggestion of Judge Beam that these terms are not sexual in content or demeaning to women"). Consider just this partial recitation of case examples set forth in *Taylor v. Renfro Corp.*, 84 F.Supp.2d 1248 (N.D.Ala.2000):

> *Green v. Servicemaster Co.*, 66 F.Supp.2d 1003 (N.D.Iowa 1999) (motion for summary judgment on sexual harassment claim denied where, accepting the statements of the plaintiff as true, the defendant repeatedly directed crude remarks toward the plaintiff, made remarks about her breasts, and promised to "knock [her] ass into her cleaning bucket"); *Franklin v. King Lincoln–Mercury–Suzuki, Inc.*, 51 F.Supp.2d 661 (D.Md.1999) (motion for summary judgment on hostile work environment claim denied where a barrage of sexual comments and conduct over the course of a month directed toward extremely religious woman); *Newtown v. Shell Oil Co.*, 52 F.Supp.2d 366 (D.Conn.1999) (motion for summary judgment on hostile environment sexual harassment claim denied where plaintiff subjected to two incidents of offensive name-calling, and was frequently referred to as a "woman" in a derogatory manner). . . . .

84 F.Supp.2d at 1258.

In contrast, judges desensitized by contemporaneous, "Vulgarians–at–the–Gate" cultural standards might find the same facts insufficiently severe, then grant the defendant summary judgment. *See Mendoza*, 195 F.3d at 1247 (majority's sum-

marization of the sexual harassment evidence held *not* actionable: Mendoza ... presented evidence of four categories of harassing conduct: (1) one instance in which Page said to Mendoza "I'm getting fired up"; (2) one occasion in which Page rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's "constant" following and staring at Mendoza in a "very obvious fashion"); *Stewart–Grove v. Alpha Construction Co.*, 132 F.3d 37, 1997 WL 786907 at * 2 (7th Cir.1997) (unpublished) (asking plaintiff out to dinner a couple of times a month, asking her to wear a dress without panties, grabbing her hand and rubbing her palm in a suggestive manner, telling her to feel his crotch did *not* constitute sexual harassment) (citing *Skouby v. Prudential Ins. Co.*, 130 F.3d 794, 797–98 (7th Cir.1997) (unwelcome sexual references and pictures of provocatively dressed women were not enough to create a hostile work environment)); *Saxton v. American Tele. and Tele. Co.*, 10 F.3d 526, 534 (7th Cir.1993) (an unwanted rubbing of plaintiff's thigh, a forced kiss and attempted grab by the alleged harasser did *not* qualify as a hostile working environment); doc. # 133 at 9–10.

*Mendoza* itself demonstrates this phenomenon. The en banc majority consumed two, multi-page, string-citing footnotes in a vain attempt to contrast sexual harassment vignettes so it could craft a judicial dividing line between sufficiently and insufficiently "severe" misbehavior. *See Mendoza*, 195 F.3d at 1249–51 n. 8; *id* at 1252—53 n. 10.

Yet, the very judicial split within that case, *see id* at 1253–78 (concurrences and dissents consuming 25 published pages)— only further illuminates the unworkability of this approach: neither side could nail the jellyfish. *See also Hocevar*, 223 F.3d 721 (split decision on whether crude, profane comments and other conduct crossed the line).

*Mendoza, Hocevar*, etc., show that, like "[t]he length of the Chancellor's foot," [4] arbitrary determinations (of just how much harassment is legally sufficient) reign here. This reality only galvanizes those who deem "attitudinal adjustment" statutes like Title VII to be a cure worse than the disease. *See* Olson, *The Excuse Factory. How Employment Law is Paralyzing the American Workplace* (The Free Press, 1997), cited in *Davis v. Bowes*, 1997 WL 655935 at * 21 (S.D.N.Y. Oct. 20, 1997) (unpublished), *aff'd*, 159 F.3d 1346 (2nd Cir.1998) (unpublished). Statutes requiring judges to "know it when they see it" [5] ultimately eviscerate the very predictability respected judicial systems require.

### E. "Nailing Away ..."

 "This circuit has required pervasive conduct by employers before finding that a hostile work environment existed or a constructive discharge occurred." *Hipp*, 252

---

**4.** "'T'is all one as if they should make the standard for the measure we call a 'foot' a Chancellor's foot; what an uncertain measure would this be! One Chancellor has a long foot, another a short foot, a third an indifferent foot. T'is the same thing in the Chancellor's conscience." John Selden 1584–1654.

**5.** Referring to "hard-core pornography," Justice Stewart said, "I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description, and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that." *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).

F.3d 1208, 1231. That requirement is well illuminated by *Mendoza,* 195 F.3d at 1246;[6] *see also Patterson v. County of Fairfax,* 215 F.3d 1320, 2000 WL 655984 at * 5 (4th Cir.2000) (unpublished) (seven instances of harassing conduct over seven years did not create a sufficiently hostile environment) (unpublished); *Adusumilli v. City of Chicago,* 164 F.3d 353, 361–62 (7th Cir.1998) (Co-employees' alleged actions of teasing, staring at, and attempting to make eye contact with city employee, and briefly touching employee on four occasions on her arm, fingers, or buttocks, together with employer's assignment of co-employee to work near employee after employee allegedly complained about co-employee's conduct, were insufficiently severe to create hostile environment).

**F. Breda's Evidence**

 As is now typical in such cases, Breda has produced a laundry list of seemingly every last comment, sneer, leer, workplace dirty trick, etc., unleashed against her. This list constitutes what she contends to be "hostile environment" evidence (the Court has substituted its record cites for hers, and has illuminated the few evidentially unsupported portions):

> [Co-worker Morris] 1) asked [Breda] if she was going to be an "Italian feminist bitch" like the two other women who had previously worked there, doc. # 53 at 370; 2) he repeatedly told her she only made sales because the male customers wanted to date her and have sex with her, *id.* at 398; 3) many times he waited for her outside the bathroom and asked her why it took so long for her to go to the bathroom and complained to her that all women took too long in the bathroom, *id.* at 530–32; 4) he regularly said he wanted to "shoot a room full of bitches dead," *id.* at 532; 5) he said that women try to trap men by getting pregnant; *id.* at 546; 6) he asked if her sex life was like a character on Star Trek who killed all of her lovers, doc. # 140 exh. C at 2; 7) he wrote her a letter in which he indicated that he had been making "pot marks [sic] at you because your [sic] female," doc. # 51 at 203 & exh. 7; 8) he broke open rolls of coins [in order to alienate her from the lab staff], doc. # 54 at 320–25; 9) he wrote a poem that stated that all women are "bitches", passed it around at work and shoved it at [Breda] and asked her what she thought of it, *id.* at 339, 534; 10) he came up to her and put his head on her shoulder approximately seven times, *id.* at 371–72; 11) he intentionally pushed her two times in the month before she

---

6. *Mendoza's* "no-claim" conclusion might rest on the lack of clear evidence that the "hip-touching" was overtly "threatening or humiliating," 195 F.3d at 1248–49, and came within a series of actions spread too far out over time to form an actionable level of sexual hostility. *Id.* at 1249, *compare Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 571 (2d Cir. 2000) (hostile work environment claim survived summary judgment where a supervisor looked at women "up and down in a way that [was] very uncomfortable" and would move toward plaintiff until she was backed against a wall; this "physically threatening" behavior crossed "the line separating merely offensive or boorish conduct from actionable sexual harassment"), cited in *Gregory,* 243 F.3d at 692–94 (Allegations in female former employee's complaint, that male supervisor made demeaning comments about women, made sexually demeaning statements, initiated unwelcome physical conduct of a sexual nature, intimidated her by standing "uncomfortably close" to her, made references to women as easy victims of sexual assault, made demeaning remarks about women, and wove vulgar and sexually explicit language into his tirades against employee, were sufficiently detailed to state a claim for hostile work environment sexual harassment under Title VII, and if proven would establish that she was required to endure an environment that objectively was severely and pervasively hostile).

resigned, both times while she was standing at the register,[7] *id.* at 415; 12) he and Darryl Reynolds crowded or "sandwiched" her several times by standing in extremely close proximity to her when she was near the register, *id.* at 415–16; 13) he asked her on five occasions to get the key to the display cabinet from his front pants pocket, *id.* at 372–73; 14) he shot rubber bands at her rear end on three occasions; *id.* at 494–95;[8] 15) he told her vulgar jokes; *id.* at 519–20; 16) he showed her nude photographs of his friend Vicki, *id.* at 521; 17) he said when she was dating a black man that "she wouldn't go out with short guys like us because she likes to have a little black in her," *id.* at 382; 18) he told her in a threatening manner that she wouldn't want to make him mad, *id.* at 356; 19) he told her many, many times that all women were "bitches," *id.* at 368; 20) he made sexual comments about all other women in the mall including one where he said a woman was not good enough for him because there "wasn't enough cushion for the pushin," *id.* at 396–97; 21) he used telephoto lenses and binoculars to ogle women in the mall when she was in their presence, *id.* at 397–98; 22) he made one direct request for a date and four indirect requests for dates, *id.* at 403; 23) he told her on many occasions in different variations that men and women should not work together, that she didn't belong in sales and that by being there she was taking sales away from him and that it caused him grief because he had to compete with a "bitch," *id.* at 405–06; 24) he called her at home on several occasions in 1995 and had nothing to say

to her, he said he just liked the sound of her voice, *id.* at 407; 25) he said she was like a character on the television show "Star Trek the Next Generation" who had long black hair and was a relator type and indicated with his hands cupped in front of his chest that she shared the same physical characteristic with the television character of having large breasts, doc. # 140 exh. C at 2; 26) he followed her around the store with a book entitled "Men are from Mars, Women are from Venus," and told her what was wrong with her; that she was the worst kind of woman, that she was too weak and too soft, doc # 53 at 496–98; 27) he went to Wal–Mart to help her pick up a Christmas tree in 1995 and, even though it was not a date by any stretch of the imagination, told her he was going to tell everyone about their "little date," doc. # 51 at 242–46; 28) he gave her a hard time because she was concerned about her appearance, doc. # 140 exh. E at 47[9]; 29) even though she asked him not to call her "Gabby" he continued to do so, doc. # 58 at 87; 30) he told her she was "asking for it" from her first day in the store, doc. # 53 at 463.

Doc. # 137 at 4–5 (footnotes added); *see also id.* at 12.

According to Breda, Reynolds formed the other half of the above-referenced "sandwich" routine (again, the Court has inserted its own record cites in place of hers):

1) he would use a telephoto lens on a camera to zoom in on [Breda's] breasts when she entered the store, doc. # 53 at 461; 2) he said to her "when are you

---

7. The evidence to which Breda cites supports her assertion that Morris twice pushed her, but her testimonial evidence does not show where he pushed her. Doc. # 53 at 415.

8. Breda conceded, however, that Morris "did not touch a private anatomy part." Doc. # 53 at 520.

9. The record evidence to which Breda cites does not support this assertion.

going to realize that black men like women with big butts?", and suggestively looked her up and down, *id.* at 375–76; 3) in the summer of 1996 he told her that his friend from Zales liked her "breasties," *id.* at 395–96; 4) he made hand signals in front of his chest to show that Ms Breda had large breasts, *id.* at 395–96; 5) he made lewd comments about other women in the mall and made cat calls, *id.* at 396–97; 6) he used telephoto lenses to ogle women in the mall when he was in their presence, *id.* at 397–98; 7) he showed her photographs of naked women, some with their legs spread wide open and left his erotic photographs lying in the open in the workplace, *id.* at 503–08, 520–21;[10] 8) he told her that the only reason she got any sales was because the male customers wanted to go on dates with her and have sex with her, *id.* at 398; 9) in front of Audie Baez, at a staff meeting, he said "we have seen a lot of Gabrielle's legs," *id.* at 414; 10) he and Robert Morris "sandwiched" her several times by standing in extremely close proximity to her when she was near the register, *id.* at 415–16; 11) he called her "frenchi," "girl" and "shorty," doc. # 140 exh. B ¶ 12; 12) he had a conversation with his father who stopped by the store; when his father left Reynolds came over to Breda and asked her if she wanted to know what his father said about her and

suggested that it was a sexual comment. *Id.* ¶ 37.
Doc. # 137 at 6–7.

According Breda all reasonable inferences, the Court must conclude that she has not met the "sufficiently severe" keystone *Mendoza and Gupta* illuminated. The above-described conduct is juvenile, offensive, and at times even meanspirited, but merely inserting every last rude or sexualized comment/gesture/joke into a lengthy list accumulated over years of employment does not, under *Mendoza* and *Gupta,* a Title VII claim make.

Admittedly, this case might make the grade in some jurisdictions. Breda insists this Court should apply those cases, and that her case in fact does make the grade under *Johnson.* Doc. # 137 at 14–15. In contrast to this case, however, *Johnson* involved uninvited *massages* from a *supervisor. See Johnson,* 234 F.3d at 509 (finding actionable sexual harassment where, *inter alia,* supervisor gave the complainant "unwanted massages, standing so close to [her] that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts....""). No one with supervisorial power abused, much less touched, Breda in any way.

The rest of the cases Breda cites are similarly distinguishable. Still, as explained *supra,* inconsistency is no stranger to this area of law. Concededly, a judge with sensitivities less dulled by contemporary vulgarianism might conclude otherwise here.[11]

---

10. The record cites Breda supplies support an inference that Reynolds subjected her to "erotic" photos, but not the open-legged description Breda employed here.

11. What is occurring in this area of law may just lead defendants to challenge Title VII, as applied in this context, as unenforceable. *Cf. Thelen v. State,* 272 Ga. 81, 82, 526 S.E.2d 60 (2000) (county noise ordinance conviction unconstitutionally vague since ordinance did not provide clear notice of what conduct is prohibited, and its enforcement would neces-

sarily be subjective; the ordinance prohibits "unnecessary" or "unusual" sounds which "annoy" others, without defining any of those terms; also, whether a sound would be defined as unnecessary, unusual or annoying depends upon the individual opinion and sensitivity of the listener); *see also id.* at 83, 526 S.E.2d 60 (A law is unconstitutionally vague if it impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications).

In any event, once the makeweight factual assertions are sifted out here (*e.g.*, Morris and Reynolds' "ogling" and "cat calling" other women in front of Breda; co-employee backlash over the fact that she took too long in the bathroom; *off-site* conduct/comments for which WCI simply cannot be held responsible, *see* doc. # 143 at 7–9; foul and rude language [12]), all that is left is a case which, while it reflects co-employee (as opposed to supervisor) sexual harassment, simply does not rise to the severity level deemed actionable by *Mendoza* and cases like it. This result moots the remaining issues and defenses.

### G. Costs and Attorney's Fees

Following its remand, the Eleventh Circuit directed this Court to reach Breda's

"Motion for Attorneys Fees and Expenses." Doc. # 128. That motion is premised on plaintiff prevailing here. *Id.* Since she has not, it must be denied.

## IV. CONCLUSION

Plaintiff Gabrielle Breda's Motion To Exceed Page Limits (doc. # 139) is *GRANTED*. Defendant Wolf Camera, Inc.'s renewed motion for summary judgment (doc. # 132) is *GRANTED*. Breda's cost motion (*see* doc. # 128) is *DENIED*. Her Complaint is *DISMISSED WITH PREJUDICE*.

---

12. *See Russell v. Bd. of Trustees of Univ. of Ill.*, 243 F.3d 336, 343 (7th Cir.2001) (University employee could not sustain claim of discrimination on hostile work environment theory in her Title VII action against her employer, although her supervisor allegedly referred to employee as "grandma," stated that all intelligent women were unattractive, referred to employee and her coworkers as "staff from hell," called each of employee's female colleagues "a bitch" at least once, stated that coworker dressed "sleazy" and "like a whore," and that coworker had been hired for her looks).