## A97A2036. HARRIS et al. v. LEADER.
(499 SE2d 374)

RUFFIN, Judge.

Margaret Harris was treated by psychiatrist Edward Leader, M.D. for approximately nine years. Harris subsequently sued Leader for, inter alia, medical malpractice, intentional and negligent infliction of emotional distress, battery, breach of fiduciary duty and invasion of privacy. Harris prayed for both compensatory and punitive damages. At trial, the court directed a verdict in favor of Leader on Harris' claims for intentional infliction of emotional distress, battery and punitive damages. The jury subsequently ruled in favor of Leader on Harris' remaining claims. Harris appeals the trial court's directed verdict and the denial of her motion for new trial. For reasons which follow, we affirm.

1. " 'A motion for directed verdict is proper where there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. OCGA § 9-11-50 (a). In determining whether any conflict in the evidence exists, the court must construe the evidence most favorably to the party opposing the motion for directed verdict. The standard used to review the grant or denial of a directed verdict is the "any evidence" test.' [Cit.]" *Roberts v. Chapman*, 228 Ga. App. 365, 366 (1) (492 SE2d 244) (1997).

(a) Viewed in a light most favorable to Harris, the opposing party on Leader's motion for directed verdict, the evidence concerning her claim of battery shows as follows. Harris first went to Leader in 1984, at which time he diagnosed her as suffering from anorexia nervosa and a borderline personality disorder. During the nine years of treatment, Harris met with Leader at least once per week in his office for therapy. On approximately six occasions during this period, Leader permitted Harris to hold his hand during therapy. Harris explained the handholding as follows: "I would sit here and he would sit there (indicating), and he would hold out his hand to me and I would take his hand and I would hold it, and I would massage it, and I would rub it. And then finally I would give him a kiss on the hand. . . ." On a "couple of occasions," Leader also permitted Harris to sit on the floor by his chair with her arms around his legs. Finally, Harris testified that they would "hug[ ] at the end of sessions."

According to Leader, he allowed the limited physical contact because he thought it may help create a bond that would benefit Harris in treatment. As for the handholding, Leader testified that although he generally did not allow any physical contact with patients, Harris "was really falling apart" and she "begged and pleaded with [him] . . . to let her hold [his] hand." Leader stated, however, that he allowed her to hold his hand only very briefly,

"probably less than a minute." Leader further testified that Harris initiated every instance of contact, except one brief hug he gave her when she did well in a school course. Harris acknowledged that "none of [the contact] was in a sexual nature."

We conclude that this contact did not constitute battery. We note initially that the relationship of physician and patient is a consensual one, and "any unauthorized and unprivileged contact by a doctor with his patient in examination, treatment or surgery would amount to a battery. In the interest of one's general right of inviolability of his person, any unlawful touching of that type is a physical injury to the person and is actionable." *Mims v. Boland*, 110 Ga. App. 477, 481-482 (1) (a) (138 SE2d 902) (1964). However, "[i]n the relationship of doctor and patient, as in other situations involving a touching of another's person, consent to the act by the person affected negates the contact as an actionable tort. 'As a general rule there can be no tort committed against a person consenting thereto, if that consent is free and not obtained by fraud, and is the action of a sound mind.' [Cits.]" Id. at 482. See OCGA §§ 51-11-1 and 51-11-2 (addressing the effect of a plaintiff's authorization and consent to the subject conduct).

"Consent" is defined as "[v]oluntarily yielding the will to the proposition of another; acquiescence or compliance therewith." Black's Law Dictionary (5th ed. 1979). A patient seeking to establish an effective withdrawal of consent must show among other things that she used language or acted in such a manner which was subject to no other inference but that the consent was withdrawn. *Williams v. Lemon*, 194 Ga. App. 249, 250 (2) (390 SE2d 89) (1990).

The undisputed evidence in this case shows that Harris authorized Leader's physical contact. In fact, as stated above, the evidence establishes that on all but one occasion Harris initiated the contact. It is clear from the parties' testimony that Harris consented to the limited physical contact as part of her treatment, and there is no evidence that she ever withdrew her consent. See *Williams*, supra. Accordingly, on the one occasion when Leader hugged Harris after he learned she did well in a college class, it is clear that Harris consented to the contact. See id.; see also 15A CJS 576, Consent (consent "exists where a person by his line of conduct has shown a disposition to permit another person to do a certain thing without raising objection thereto"). There being no evidence of an effective revocation of consent by Harris to Leader's physical contact, the directed verdict on Harris' claim for battery is affirmed. See *Roberts*, supra.

(b) To prevail on her claim for intentional infliction of emotional distress, Harris was required to present evidence of "four elements: (1) intentional or reckless conduct (2) that is extreme and outrageous and (3) causes emotional distress (4) that is severe. [Cit.]" *Mears v.*

*Gulfstream Aerospace Corp.*, 225 Ga. App. 636, 638-639 (1) (484 SE2d 659) (1997). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim 'Outrageous!'" (Citation and punctuation omitted.) *Yarbray v. Southern Bell Tel. &c. Co.*, 261 Ga. 703, 706 (2) (409 SE2d 835) (1991). "Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law. [Cit.]" Id.

The record in this case contains no such evidence. In support of her claim, Harris presented expert testimony showing that her borderline personality disorder could have resulted in "all kinds of difficulties, including addictions, pathological attachments to people, neediness and dependency and the like." The expert explained that in treating this disorder "you are attempting to kind of help the person cope with the stormy feelings, do the things that will not stir them up and do the things that will calm those storms down until the person gets to be able to take care of and take charge of their lives again."

There is abundant testimony showing that Harris had such a pathological attachment to Leader. For example, Harris testified: "I felt like he totally controlled my life, I couldn't live without him. He was a part of my very soul and existence, and I was nonfunctional unless we were in contact with each other. He would tell me I was needy, dependent, and other descriptive words like that, that I think fostered those feelings." She also stated: "I thought he was God. As a matter of fact, when I would go to church I was so mixed up, when we would sing hymns at church I was praising Dr. Leader. I wasn't praising God, I was praising Dr. Leader. And I would tell him that. He knew it." Harris also testified that she told Leader that she loved him: "I would say, 'Dr. Leader, I love you so much. You are my world.' . . . He would say, 'I know it.' Or he would reciprocate by saying how much he loved me." Harris also sent Leader letters in which she expressed her love for him. In one letter, Harris wrote "I don't want to stop loving you, Dr. Leader. It hurts deeply just to think about this."

According to Harris, despite Leader's knowledge of her pathological attachment to him, his conduct often fostered her infatuation. The most notable instance of Leader's conduct cited by Harris concerns the circumstances preceding an attempted suicide, the fourth of which Harris committed during her treatment with Leader. In this instance, as they had done in the past, Leader arranged for a telephone treatment session. According to Harris: "[W]e talked . . . about sexual fantasies, and I confronted him about it, and I said, 'I want to know, do you have sexual fantasies about me.' And he said, 'I can't deny it. I do have sexual fantasies about you, but I don't act

upon them.' That shocked me." Though the testimony is unclear, it shows that at some point during the week that followed, Leader called Harris on the telephone and during that conversation she ingested numerous sleeping pills in an attempt to kill herself.

In opposition, Leader presented expert testimony showing that a psychiatrist's self-disclosure, such as the statement at issue here, is important in therapy. Specifically, the expert testified that "there are many different schools of therapy. There is no one standard that everybody adheres to. In the humanistic approach, self-disclosure is considered very important. I will tell . . . a patient, I will say, 'You know, I had a very similar problem, and this is how I overcame it. Try it on for size, it worked for me, it may work for you.' That's a self-disclosure. See, I haven't pretended that I'm sort of a super human being who never had problems. I revealed I had the same problems."

Even viewing all the foregoing evidence in a light most favorable to Harris, it shows only that there are different schools of thought concerning whether self-disclosure is appropriate, and that Leader provided therapy under the humanistic school which favored self-disclosure. Though Leader's disclosure to Harris that he had sexual fantasies for her may be facially troublesome to the average layman, considering the debate between members of the psychiatric community, it is not such a statement that would rise to the level of outrageousness. Thus, despite Leader's awareness of Harris' particular susceptibility to injury from emotional distress, we conclude that his conduct was insufficient to support her claim for intentional infliction of emotional distress. Compare *Williams v. Voljavec*, 202 Ga. App. 580 (415 SE2d 31) (1992) (physician relentlessly vented angry statements toward a hospitalized cardiac patient) (physical precedent only). Accordingly, the trial court did not err in directing a verdict for Leader on this claim.

(c) For the same reasons, we find Leader's conduct was insufficient to support a claim for punitive damages. "To authorize the imposition of punitive damages there must be evidence of wilful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences. The latter expression relates to an intentional disregard of the rights of another, knowingly or wilfully disregarding such rights. Mere negligence, even gross negligence, will not support an award of punitive damages." (Citations and punctuation omitted.) *Evans v. Willis*, 212 Ga. App. 335, 338 (1) (b) (441 SE2d 770) (1994).

As stated in Division 1 (a) and (b), Harris has cited no evidence of such conduct in this case. Accordingly, the trial court properly granted Leader a directed verdict on Harris' claim for punitive damages.

2. Harris also asserts that the trial court erred in denying her motion for new trial on her medical malpractice claim because there was sufficient evidence supporting the claim. We disagree.

" 'A trial judge's denial of a motion for new trial on evidentiary grounds will be reversed on appeal only if there is no evidence to support the verdict.' [Cit.] . . . It is the function of the jury to resolve conflict in testimony ([cit.]); this Court will not substitute its judgment for that of the jury and will neither weigh evidence nor determine witness credibility. [Cit.]" *Stubbs v. Harmon*, 226 Ga. App. 631, 632 (1) (487 SE2d 91) (1997).

The relevant issue decided by the jury in this instance was whether Leader complied with the standard of care required in his treatment. OCGA § 51-1-27; *Williams v. Mem. Med. Center*, 218 Ga. App. 107, 108 (1) (460 SE2d 558) (1995) (physical precedent only). Though Harris presented evidence showing that Leader's conduct did not comply with the applicable standards of care, Leader cites to evidence that his treatment did comply with these standards. In light of this conflicting evidence, the trial court did not err in denying Harris' motion for new trial based on the sufficiency of the evidence supporting her claim for medical malpractice. See *Stubbs*, supra.

*Judgment affirmed. Birdsong, P. J., and Eldridge, J., concur.*

DECIDED MARCH 20, 1998 —
RECONSIDERATION DENIED MARCH 31, 1998 ▮▮▮▮▮▮▮▮▮▮

*Barnes, Browning, Tanksley & Casurella, Jerry A. Landers, Jr.*, for appellants.

*Hawkins & Parnell, Alan F. Herman, Anita T. Wallace*, for appellee.