**Deborah J. FOGAL, Plaintiff,**

v.

**COASTAL RESTAURANT MANAGEMENT, INC., d/b/a Taco Bell and Morgan Shane Denson, Defendants.**

No. 403CV098.

United States District Court, S.D. Georgia, Savannah Division.

April 19, 2004.

W. Kerry Howell, Jerry A. Lumley, Lumley & Howell, LLP, Macon, GA, for Plaintiff.

Terry L. Readdick, Whelchel, Brown, Readdick, Bumgartner, Brunswick, GA, Catherine M. Bowman, Morton G. Forbes, Forbes and Bowman, Savannah, GA, for Defendants.

## ORDER

EDENFIELD, District Judge.

### I. INTRODUCTION

This case sounds like a *really* bad joke. In fact, it stems from one. As described in both industry and mainstream media, a prankster's been posing as a police officer and calling restaurants, convincing managers to strip search employees for suspected crimes.[1] Both managers and employees have fallen for the prank, with some searches "going the distance" and thus

---

1. *See* www.foodservice.com/news_homepage_expandtitle_fromhome.cfm? passid=8760;ab-cnews.go.com/sec- tions/GMA/US/Strip_hoax_040331–1.html (sites as of 4/19/04).

giving rise to allegations of harassing sexual contact. *Id.*

That's essentially what plaintiff Deborah J. Fogal claims happened in this case, where a prankster called—*collect*—defendant Coastal Restaurant Management, Inc.'s (CRMI's) Taco Bell restaurant, spoke with co-defendant Morgan Shane Denson (one of the store's managers) and convinced him—*and* Fogal—to strip search her for evidence of a coin purse theft (and her car for marijuana possession).

Fogal now sues CRMI and Denson for, *inter alia*, emotional distress and sexual harassment. Doc. # 1. While she believes that Denson was *not* part of the hoax and took no pleasure from it, nevertheless he was her supervisor, doc. # 25 at 157–58, so she seeks to hold CRMI liable on *respondeat superior* grounds. Doc. # 1 ¶ 27. Denson and CRMI both move the Court for summary judgment[2] (doc. ## 26, 31) and for leave to amend the Court's scheduling Order to add additional witnesses. Doc. ## 73–74.

## II. BACKGROUND [3]

Fogal was a virginal, 19-year-old preacher's daughter and Georgia Southern University student when she began work at CRMI's Statesboro, Georgia Taco Bell store in 9/02. Doc. # 25 at 8, 10, 12, 24, 32–33, 158. She had never met Denson before, nor socialized with him outside of work. *Id.* at 36–37. Nor did Denson ever act inappropriately or express any romantic interest toward her prior to the hoax. *Id.* at 38. And she had never seen him act inappropriately toward anyone else. *Id.*

Both Fogal and Denson worked the evening shift on 11/25/02, when the male prankster called the store collect and Denson was summoned to the store's office phone. Doc. # 25 at 44, 53, 65; # 40 at 32, 42, 67–68, 74; doc. # 43. The caller claimed "he was a Statesboro police officer and that they had received a complaint that a [customer's] purse had been stolen, change purse had been stolen." Doc. # 40 at 74, 76. He gave no name or rank, nor stated how much change had been stolen, and Denson didn't ask. *Id.* at 74–77. He also told Denson that Denson's supervisor, Debra Moore, "was on the phone with [the caller's] captain [and] that she knew about the charges—or that the purse had been stolen." *Id.* at 77.

Denson "asked him who supposedly stole the purse." *Id.* The caller "described a female employee" and "that description fit Ms. Fogal." *Id.* at 78. So, Denson summoned Fogal, then working a cash register, to the office. *Id.* at 79; doc. # 25 at 57. He explained to her what the caller told him, then handed her the phone. Doc. # 40 at 82. The caller told her "that there was a purse stolen with a lot of money in it, and I fit the description of the person who stole it." Doc. # 25 at 60. She came to believe that the caller was a "detective." *Id.*

To Fogal, Denson seemed confused by the call. *Id.* at 61. The two would both spend the better part of the next two hours alone in the restaurant's office together, interacting with the caller. During that time, Fogal got "on the phone with the [caller] . . . every now and then." Doc. # 25 at 65–66. Still, she could not precise-

---

**2.** This Court will apply the summary judgment standards set forth in *Carlton v. Wal-Mart Stores, Inc.*, 234 F.Supp.2d 1358, 1360 (S.D.Ga.2002).

**3.** Given the incredible facts of this case, as well as plaintiff's unacceptably distorting spin on them in her brief, doc. # 41, the Court hereafter will rely almost exclusively on Fogal's own deposition testimony (doc. # 25) to recreate the factual background to her claims.

ly remember (on 8/23/03, the date of her deposition) what was said by whom:

Q. What was said next?

A. I don't remember.

Q. What's the next thing you remember being said?

A. About like the cops can either arrest me and do a strip search or whether they could do one there.

Q. You said they. Who's they?

A. The police.

Q. So you said the cops could come and arrest you and do a strip search, or they could do one there. What does that mean?

A. The manager at Taco Bell.

Q. So it was your understanding that your choice was to have policemen come and arrest you and take you somewhere to be strip searched or to have [Denson] strip search you?

A. Yes, ma'am.

Q. Who told you it was your choice?

A. [Denson].

Doc. # 25 at 61–62.

Fogal at that time made no inquiry to confirm that the call was genuine:

Q. All right. Why did you agree to have Mr. Denson do this strip search?

A. I didn't want to be arrested.

* * *

Q. But when you made the decision to be strip searched, it was your understanding that the man on the phone was a detective?

A. Yes, ma'am.

Q. Now you knew this man had called collect; correct?

A. Yes. I hadn't thought about that, really.

Q. And what was your understanding as to what police department he was from?

A. I didn't.

Q. You weren't told he was with the Statesboro police?

A. No, ma'am.

* * *

Q. Did you get on the phone with the man?

A. Every now and then.[4]

Q. Did you get on the phone to give your consent [to the strip search by Denson]?

A. No ma'am, I said it outloud (sic).

Doc. # 25 at 64–66 (footnote added).

While Denson verbally relayed parts of the caller's communication to her, Fogal acknowledges that Denson also "thought, you know, this was stupid and you know, stuff like that," and he otherwise did not suggest anything independently to her. Doc. # 25 at 67–68. To that end:

Q. Mr. Denson would relay to you what the man said on the phone said; correct?

A. Uh-huh, yes, ma'am.

Q. And Mr. Denson expressed to you his personal opinion that the goings on were stupid; correct?

A. Yes, ma'am.

Q. But he didn't offer his opinion one way or the other as to whether you

---

4. *See also* doc. # 25 at 73 (she spoke with the caller "probably" more than five times, but does not know if it was more than ten). Denson deposed that he constantly "handed [Fogal] the phone" before the caller directed him and Fogal to comply with "the investigation."

Doc. # 40 at 144–45; *see also id.* at 174 ("Q. [I]s it a fair statement that every step of what happened that she also talked to this individual on the telephone? A. Yes. Everything—before anything new or anything happened, she talked to the guy on the telephone").

should do the things as directed by the fellow on the telephone, did he?

A. No, ma'am.

Q. Is that correct?

A. Yes, ma'am.

\* \* \*

Q. Well, let me ask you that. Why did you believe this was real?

A. I didn't have anything else to say it wasn't real. [The caller] sounded real. Everything seemed real.

\* \* \*

Q. So before you decided to do this, you actually spoke with [the caller]?

A. I believe I did.

Q. And you did not find it unusual that a policeman would call collect and suggest that a civilian would strip search you?

A. I didn't know anything. I don't know anything about strip searches or stuff like that. And I had just totally forgotten that it was a collect call. I was scared.

Doc. # 25 at 69–70.

The caller also told Fogal that Taco Bell might be "embarrassed":

A. [Denson] said that I guess the guy on the phone had said, you know, to save Taco Bell the embarrassment, you know, you could have her come to the police department and be stripped searched.

Q. So what [Denson] said was that if Taco Bell didn't want to be embarrassed by this whole thing, you could just go over to the police department and they would deal with it there?

A. Yes, ma'am.

Q. But you chose not to go to the police department because you didn't want to be arrested. You chose for Mr. Denson to do it?

A. Yes, ma'am.

Q. And did Mr. Denson agree to do it?

A. Yes, ma'am.

Q. And it was you understanding he was doing it because that's what you wanted?

A. It wasn't what I wanted.

Q. *It was the choice you made?*

A. *Yes, ma'am.*

\* \* \*

Q. Were there any acts on the part of Mr. Denson that led you to believe this was something [Denson] wanted to do?

A. *No.*

Doc. # 25 at 70–71 (emphasis added).

Fogal did not ask to speak to anyone else (*e.g.*, her parents) before consenting to the search by Denson. Doc. # 25 at 67. She concedes she was never told that she could not speak to anyone else during the incident. *Id.*

Denson locked the office door and Fogal, who nevertheless at all times felt free to leave, took her hair down and allowed Denson to run his hands through it to check it. Doc. # 25 at 72–74; *see also* doc. # 40 ("Q. Did she ever tell you that she wanted to leave the room? A. No."). She then took off her shoes; Denson "read the tag [on them] and put them in the [office] safe." Doc. # 25 at 74. Then she took her socks off and he likewise put them in the safe. *Id.* at 75.

Q. What happened next?

A. I think I had to take my pants off, maybe.

Q. All right. Who told you to take your pants off?

A. I think it was [Denson].

Q. And did you say you would or would not?

A. I would.

*Id.* at 75.

Denson read the pants label to the caller, then turned them inside out and put them, too, in the safe. *Id.* at 75–76. Pursuant to the caller's instructions, Fogal then gave a physical description of herself (there was no speaker phone, "but it was a small office" and she believed the caller could hear over the phone). *Id.* at 76–77, 78. Denson stood still or sat in a nearby chair while Fogal disrobed. *Id.* at 77–78.

Q. And what's the next thing that happened after [Denson] put your pants in the safe?

A. For me to take my shirt off.

Q. And what was said when you took your shirt off?

A. [Denson] told me to give it to him, and he turned it inside out, and then [Denson] read the tag to the man on the phone.

Q. And then what did he do?

A. I think I had to take my underwear off.

Q. I'm sorry. What did he do with the shirt once he turned it inside out?

\* \* \*

A. [Denson] put it in the safe.

Q. What were you next directed to do?

A. Take my underwear off.

Q. Did you have both panties and a bra?

A. Yes, ma'am.

Q. Were you told one or the other or just both pieces of underwear off?

A. One at a time.

Q. Now, your—before that happened, you're basically in nothing more revealing than a bikini; correct?

A. Yes, ma'am.

Q. At the time he then directed you to take off your bra and/or your panties, which did he ask you to do first?

A. I think it was my panties. I don't remember.

Q. Did you enter any type of objection?

A. Well, sure I did. I don't remember, but—

Q. You don't remember whether you did or not?

A. No, ma'am.

\* \* \*

Q. It was your understanding that what was actually stolen was a purse; correct?

A. Yes, ma'am.

Q. What type of purse was it your understanding as to what was stolen?

A. It was like a little bag, a little pouch.

Q. More of a change purse than a handbag?

A. Yes, ma'am.

Q. And by change purse, you're normally talking about something that's probably two inches square? About that size? Is that your understanding of what was missing?

A. Probably.

Q. So you took your panties off, and what did you do with them?

A. I gave them to [Denson].

Q. All right. What was—what did [Denson] do with your panties?

A. I think he just put them in the safe. I don't remember if he read the tag or not.

Q. What was [Denson's] demeanor at this time when you handed him the panties?

A. I don't remember.

Q. Did he act embarrassed?

A. Maybe. I don't remember.

Q. He didn't leer at you, did he?

A. *I don't understand.*

Q. He didn't look at you in an aroused type of way, did he?

A. No, ma'am.

Q. Was he business like?

A. Yes, ma'am.

Q. Did he laugh at you during this time?

A. No, ma'am.

Q. What was the next thing you were directed to do?

A. I had to take my bra off.

Q. And what was done after you took your bra off?

A. He put that in the safe. [Denson] put that in the safe as well.

Q. Do you recall [his] demeanor when you took your bra off?

A. I don't remember.

Q. Did—what happened after he put the bra in the safe?

A. The next thing I remember was just doing exercises. I was told to do jumping jacks and to count outloud (sic) so the man on the phone could hear me. Just to jump up and down, run in place, and at first I didn't know why I had to do it, but then I found out it was so I would sweat.

Q. How did you find out it was so you would sweat?

A. I don't remember.

Q. At this point are you totally naked?

A. Yes, ma'am.

Q. Who told you to do the exercises?

A. [Denson].

Doc. # 25 at 78–82 (emphasis added).

Fogal would periodically speak directly with the caller, who instructed her to pretend like she had been placed on hold while he spoke with her. *Id.* at 83. She did (after she'd stripped naked and had performed exercises):

A. And he [the caller] would just be like okay, you know, we're going to—I need you to do this. Well, I believe he started asking, you know, talking to me more like—at some point he told me that he believed I didn't do it or something, or he wasn't sure if I did or not. And so he wanted to see who really did it, if [Denson] did it, so he asked me to act real flirtatious and all that crap, and I was just like I can't do that. I'm not like that. So he was like whatever.

Doc. # 25 at 83–84.[5]

Fogal explained why she exercised after completely disrobing:

5. To further the ruse, the caller told Fogal that she would be paid for her troubles:

Q. When did the man tell you you were going to be paid for your troubles?
A. When he asked me to be flirtatious [with Denson].
Q. And when did he tell you you'd be paid?
A. He asked—it was about five thousand.
Q. And who did he say was going to pay you?
A. He didn't but said [Taco Bell supervisor] Ms. Moore was in [the police station with the caller]—he said she was writing out the checks, so I guess it was her.

\* \* \* \* \* \*

Q. So it was your understanding that what he wanted you to do for the five thousand

dollars was to arouse Mr. Denson to determine whether or not he was the man who had stolen the purse; correct?
A. Yes, ma'am.
Doc. # 25 at 131–32. Nevertheless, Denson remained unaffected and composed:
Q. Were there any facts that led you to believe that anything you did that night or anything that happened that night aroused Mr. Denson?
A. No, ma'am.
Q. Did Mr. Denson ever linger in any one place when he was massaging your body?
A. No, ma'am.
Q. Did Mr. Denson ever make any inappropriate comments about your body?
A. No, ma'am.

Q. And you continued to do things [like exercise] that you were told to do, and my question to you is why you would continue to do that? You had proven, had you not, your innocence of having any money?

A. Yes, ma'am.

Q. Why did you start doing these exercises? [6]

A. Because the guy was saying he needed me to see if [Denson] had done it, so—

Q. So you thought you were assisting the police in doing this?

A. Yes, ma'am.

Q. And was it your understanding that you were supposed to arouse Mr. Denson?

A. I didn't think it was—maybe, yes, ma'am.

Q. And why would arousing Mr. Denson tell the police anything? What was his explanation of that?

A. *I really have no idea.*

Q. All right. So how long do you think it was that you did these exercises?

A. I was in the office about two hours, so I guess maybe most of that time.

Q. How long did it take you to take off your clothes?

A. I don't remember. Maybe 20 minutes, 15.

Doc. # 25 at 86–87 (emphasis and footnote added).

Q. Did he ever do anything to you physically that you did not agree to?
A. No, ma'am.
Q. Did he ever laugh—did Mr. Denson ever laugh when any of this was going on?
A. No, ma'am.
*Id.* at 132–33; *see also id.* at 176.

**6.** Fogal was asked:
Q. [W]hat was your understanding . . . of the purpose of this massage?

During the "exercise period," Denson, who locked the safe, left the office to check Fogal's car (she'd told him where her keys were) for marijuana, as the caller had directed. Doc. # 25 at 89–92. She spoke with the caller while Denson was gone, but did not ask any questions to confirm his bona fides. *Id.* at 93–94 ("A. I didn't think about it. I was scared"). She assumed the safe was locked so she made no attempt to put her clothes back on; nor did she express to Denson that she wanted to do so. *Id.* at 94–95 (Denson never denied her access to her clothes or prevented her from leaving); doc. # 40 (Denson dep.) at 174–75 ("Q. Did she ever tell you to give her her clothes back? A. No").

During this time, plaintiff believed that the police were heading to the store, and that by having Denson strip search her she could avoid an arrest. Doc. # 25 at 96–97. Even though the Statesboro police station was nearby, she did not wonder why it was taking two hours for them to arrive because "[the caller] never told me where they were coming from" and she didn't ask. Nor did she ask to wait for the police to arrive before undergoing the strip search. *Id.* at 98. From her conversations with the prankster, Fogal recalls that he sounded 30–40 years old, professional and versed in legal terms. *Id.* at 104. With a compassionate tone, he told her he knew she was scared and tried to calm her down. *Id.* at 103–05.

Denson re-entered the office and reported to the caller that he'd found no marijua-

A. To see if there was green residue on my body.
Q. And it was your understanding that the green residue would be left if money had touched your body?
A. Yes, ma'am.
Doc. # 25 at 110–11; *see also id.* at 88 (At this time, Fogal was an "exercise major" at her university).

na in Fogal's car. Doc. # 25 at 105. The caller then directed more exercise:

> Q. Were you told to exercise at all any more after Shane Denson left to go search your car?
>
> A. Yes, ma'am. I think so.
>
> Q. And how long did you exercise before you were told to stop and let [Denson] touch you?
>
> A. I don't remember.
>
> * * *
>
> Q. What was the next—when did you become aware that [Denson] was to touch you?
>
> A. Just the time he said that he had to, you know, in order to see the green residue, he had to like rub his hands and make them warm like that and rub my body and see if there was anything on it.
>
> * * *
>
> Q. Did Mr. Denson tell you what he was about to do?
>
> A. I don't remember, he probably did.
>
> Q. Did you object to Mr. Denson touching you?
>
> A. Not at first, because he was just touching my arms and my legs.
>
> Q. And so when he touched your arms and legs you did not object?
>
> A. No, ma'am.

Doc. # 25 at 105–08 (footnote added). Fogal later elaborated:

> A. It was pretty much understood that I didn't want it [*i.e.*, Denson touching her], but, I mean, I wasn't like no, don't do this.
>
> Q. You said it was pretty much understood you did not want this. Why is it that you were doing this?
>
> A. Because I thought I would be arrested. The guy told me if I didn't do

everything he said, and if I objected, I would be arrested.

> Q. So this was *your choice* to have Mr. Denson do this so that you can't get arrested by the man on the phone; is that correct?
>
> A. *Yes, ma'am.*

Doc. # 25 at 109–110 (emphasis added).

Once plaintiff's legs and arms were "cleared" for "money residue" (*see supra* note 6), the caller instructed Denson to massage her shoulders and chest. Doc. # 25 at 112.

> Q. Did you tell him not to do that?
>
> A. No.
>
> Q. Did it upset you that he did that?
>
> A. Yes.
>
> Q. Did you tell—I mean did you raise any objection to this at all?
>
> A. I mean I was sitting there saying this is retarded, but I wasn't, no.
>
> Q. Did Mr. Denson agree with you?
>
> A. Yes, ma'am.
>
> Q. And so you and Mr. Denson are both agreeing this was—I think your word was retarded—but you both continued to do it?
>
> A. Yes, ma'am.

Doc. # 25 at 112–13. Fogal was convinced that both she and Denson could not stop lest she be arrested. *Id.* at 113. After Denson massaged her chest, he spoke with the caller again and, as instructed, massaged Fogal's stomach, then reported back that he'd likewise detected no residue there, either. *Id.* at 114. Still not content, the caller issued additional instructions:

> Q. Did Mr. Denson ever touch your buttocks?
>
> A. Yes, ma'am.
>
> Q. What did he do on your buttocks area?
>
> A. He just slapped it.

Q. You said he just slapped it. Was that done directly after him massaging the other parts of your body?

A. I don't remember. I think it might have been when he was massaging. I don't remember, but I was bending over.

Q. Why were you bending over?

A. Because I was told to.

Q. Who told you?

A. [Denson] did.

Q. Did the fellow on the phone tell you to bend over?

A. He—the guy on the phone didn't tell me, no ma'am.

Q. Did you object to bending over?

A. *No ma'am, not any more than I did anything else.*

Q. What happened when you bent over?

A. I had to touch my toes, and [Denson] was told [by the caller] to slap my butt.

Q. Did you know he was going to slap your butt before he did it?

A. No, ma'am.

Q. And what was your reaction when he did that?

A. It made me mad.

Q. And why did—what did you say?

A. I didn't say anything, I don't think.

Q. How many times did he slap your butt?

A. Maybe three times.

**7.** The caller told Denson that Fogal needed to be "humiliated" into confessing, so Denson would have "to smack her butt." Doc. # 40 at 139. Denson says he gave Fogal the phone so she could receive that instruction directly. *Id.* She then bent over and touched her toes and he "smacked her a couple times ... [on j]ust the cheeks." *Id.* at 141. But the caller did not believe Denson had complied with his instructions:

> Q. Right. You [therefore] put the phone up to her butt?

Q. And did you *tell him to stop?*

A. *No, ma'am.*

Q. Did you ever—did you have any understanding as to why [Denson] did it?

A. *No, ma'am, not any more than believing the guy on the phone told him to do it.*

Doc. # 25 at 114–16 (emphasis added).[7]

Fogal continued to *not* ask to leave or for her clothes back, and confirms that Denson told the caller she did not want to do what was requested of her. Doc. # 25 at 118–19. Yet, the caller spoke directly to her and instructed her to sit on Denson's knee. *Id.* at 119.

> Q. Was it your understanding you were having to sit on his knee in an attempt to arouse him like you were told to do earlier by the fellow?
>
> A. I thought then it was—maybe, or to look in my mouth because I had to sit on his lap so he could look in my mouth.

\* \* \*

> Q. And what was [Denson's] response when you got—when you sat on his lap?
>
> A. I just—I mean I just had to do what he said. He didn't really respond.

\* \* \*

> A. I mean, he was just as open as he was to the rest of it. I mean, he didn't object any more or act any differently.

> A. Yes.
> Q. And hit her again; is that right?
> A. Yes.
> Q. So he could hear it?
> A. Yes.

*Id.* at 143. After the third smack, Denson handed Fogal the phone so the caller could talk to her. "That's when she asked me if she could kiss me." *Id.* at 144.

Q. Was he still professional?

A. *Yes, ma'am.*

Q. He still acted like he thought this whole thing was stupid?

A. *Yes, ma'am.*

Q. It was not anything he was enjoying?

A. *I don't think so.*

Q. All right. So you sat on Mr. Denson's knee and then what did you do?

A. I had to stick out my tongue and see if anything was in my mouth.

Q. And then what.

A. And then he massaged my chest.

Q. While you were sitting on his lap?

A. Yes, ma'am.

Q. And what was the purpose of that?

A. For the green residue.

Q. So this was not the *second time* he massaged your chest, this was the first time he massaged your chest; is that correct?

A. Well, my breasts *this time.*

Q. And did he report to the fellow on the phone—

A. Yes, ma'am.

Q. —whether there was any residue?

A. Yes, ma'am.

Q. What happened next?

A. I was instructed to kiss him.

Q. Who instructed you to kiss him?

A. I don't remember if it was the man on the phone or [Denson].

Q. Did [Denson] object to you kissing him?

A. No.

Q. He didn't say he didn't want you to kiss him?

A. He didn't say I don't want you to kiss me, but you know, I could tell he thought that was stupid. He was like, why? Why does that have anything to do—

Q. So [Denson] was questioning at this point why this was going on?

A. Uh-huh.

Q. Is that a yes?

A. *Yes, ma'am.*

Q. You understood that this didn't make sense to [Denson] at this point?

A. *Yes, ma'am.*

Q. And you continued to *choose to go on* with this because you were afraid of being arrested, is that right?

A. *Yes, ma'am.*

Doc. # 25 at 118–123 (emphasis added). The prankster persisted:

Q. *You were instructed by the fellow to kiss [Denson]?*

A. *Yes, ma'am.*

Q. [Denson] was expressing an *objection* to this because it didn't make sense to him, correct?

A. *Yes, ma'am.*

Q. How was it, then, that you did, indeed, kiss [him]?

A. *I just did.*

Q. And how did you kiss him?

A. Just a small little peck?

Q. And did you small peck on his mouth?

A. Yes, ma'am.

Q. And what happened after you small pecked on his mouth?

A. The guy on the phone said he didn't hear it or whatever.

Q. He told you that?

A. I don't remember. I think—I believe I told [Denson].

Q. And so what happened next after the fellow said he didn't hear the kiss.

A. *I had to kiss him again.*

Q. Did [Denson] object?

A. No.

Q. And how did you kiss him the second time?

A. The same way.

Q. Again, a small peck on his mouth?

A. Yes, ma'am.

Q. What happened next?

A. The man on the phone didn't really believe us, but, we were like, well, we did it, whatever, so we wouldn't do it again. So he was like now I want you to *French kiss* him.

Q. The man on the phone did not believe that y'all actually kissed, and you said you weren't going to do it again?

A. Yes, ma'am.

Doc. # 25 at 124–26 (emphasis added). Fogal "told the guy no on the phone, and [the caller] got mad again. He was like well, if you don't do it, then [Denson's] probably going to arrest you. So I was like okay.... He said [Denson's] got the power to have me arrested." *Id.* at 126–27.

Q. Did [Denson] indicate to you that if you didn't French kiss him, he was going to have to arrest you?

A. No.

Q. [Denson] didn't want to French kiss you, did he?

A. I doubt it.

Q. So when the fellow said that— threatened you with arrest, *did you choose to kiss [Denson]?*

A. *Yes, ma'am.*

Q. And so what did you do?

A. Then that was it. I didn't do it again. He asked us to do it again, and I was like no.

Q. *So you did French kiss [Denson]?*

A. *Yes, ma'am.*

Q. And how long did it last?

A. A split second.

Q. *You stuck your tongue in his mouth?*

A. *Yes, ma'am.*

Q. Did he respond to that?

A. Somewhat, as much as you can in a split second.

Q. Was [Denson] still acting disgusted?

A. *Yes, ma'am.*

Q. Was he acting confused?

A. *Yes, ma'am.*

Q. *Was he acting like he didn't like all this?*

A. *Yes, ma'am.*

Q. And did you not feel he was aroused by any of this?

A. I don't think so.

Doc. # 25 at 127–29 (emphasis added).[8]

Denson testified that he had no memory of *French* kissing, but of "regular" kissing

---

8. Plaintiff elaborated:

> Q. But it was your understanding that [Denson] did not want to have you kiss him; is that correct?
> A. Yes, ma'am, no more than sit on his lap.
> Q. And the [caller] told you that to avoid being arrested, you had to kiss [Denson]?
> A. Yes, ma'am.
> Q. And you told [Denson] that; correct?
> A. I told him what?
> Q. That you had to kiss him to so that you didn't get arrested?
> A. Well, I mean, I didn't say that.

> Q. You told him the man wanted you to kiss him and that you were going to kiss him?
> A. *Yes, ma'am.* I would sit there and call him Mr. Boss Man and crap.
> Q. So you said [to Denson] Mr. Boss Man said I had to kiss you?
> A. I had to call [Denson] Mr. Boss Man.
> Doc. # 25 at 122–23 (emphasis added); *see also id.* at 158 ("Q. Had you ever had any type of sexual relationship to date? A. No. Q. Had you ever been naked in front of a man not a member of your family before this incident? A. No, ma'am. Q. Have you ever since? A. No, ma'am.").

Fogal while placing the phone by their faces so the caller could hear their kissing. Doc. # 40 at 149. The light bulb finally went off in Denson's mind when the following occurred:

Q. What happened next?

A. She stood up, and [the caller] asked me if I wanted to receive oral from her.

Q. Is that his term, oral?

A. Yes.

Q. He didn't say oral sex?

A. I don't remember if he said oral or oral sex but I knew what he meant.

Q. He did say oral sex?

A. I don't remember.

Q. So the phone is back in your hands and at your ear at this point?

A. Yes.

Q. And is that pretty much the quote of what he said, Do you want to receive oral sex from her?

A. Yes.

Q. And what did you say?

A. I told him no. And he said that he could make it happen.

Q. And at that point did you figure out that he was not legitimate?

A. Yes.

Doc. # 40 at 150–51, as *errata-sheet* amended.[9]

Denson then hung up the phone, gave Fogal her clothes back, dialed up the *real* police, handed her the phone, then left the office, closing the door behind so she could get dressed and speak to the police. Doc. # 40 at 151–52. He then returned to work, but later checked back on Fogal (she was dressed, sitting and crying; he asked her if she was "okay" and she did not respond). Fogal later rejoined the night crew for the rest of her shift. *Id.* at 152–55.

 During that time, she learned from a customer that a similar prank had just been pulled at a nearby "Ruby Tuesday's" restaurant that night. *Id.* at 155; *see also* doc. # 25 at 133–35; doc. # 26 exh. 2 at 2–4, 7–8, 15–16 (male "Ruby Tuesday" employee recounting, in a Statesboro, Georgia police report, that on 11/25/02 he was summoned to restaurant office by female manager, voluntarily stripped-searched for "a key that had been stolen from the store"; manager was told to make his penis "fully erect"; after failing to do so, manager grabbed it to look under it and reported result to caller; this routine was essentially repeated with a second male employee).[10]

---

9. Fogal reached the same realization:

Q. You knew by the time that [Denson] had hung up the phone that Ms. Moore wasn't really going to write you a check for five thousand dollars, didn't you?

A. Yes, ma'am.

Doc. # 25 at 154.

10. Plaintiff objects to the consideration of these police records. Doc. # 45. Generally, a police report containing an officer's factual findings, as well as matters observed by him, can be admitted under "public records" exception to the hearsay rule. *In re Byrd,* 294 B.R. 808, 811–12 (Bankr.M.D.Ga.2003); Ga. Rules Of Evidence § 19.19 (*Public Records—Documents Made And Kept By Public Agencies* ) (2d ed. 2003) ("[A] report may be admissible if prepared by an agency that is presumed independent of any party and the report is not in anticipation of state action against a party. Thus routine reports prepared by the police should be admissible in a civil case to prove matters observed and recorded by the officer but not inadmissible hearsay statements in the report or the officer's opinions or conclusions").

The records cited here are not police-officer findings or observations, but rather handwritten statements submitted by "hoax-search" victims themselves, as contained in certified police records collected/stored in the ordinary course of police business. Hence, they don't quite fit under the general rule, but arguably are admissible under the reasoning set forth in *U.S. v. Barrentine,* 591 F.2d 1069, 1082 (5th Cir.1979), cited in Hearsay Handbook 4th

CRMI fired Denson for "unprofessional conduct" shortly thereafter. Doc. # 40 exh. 5. Fogal, who never returned to work, doc. # 25 at 168–70, stands by her testimony that Denson was "not in on" the prank or otherwise acted inappropriately, yet she has chosen to sue him:

Q. Why is it that you think Mr. Denson should pay you money for what happened that night?

A. Because I mean I don't know if he's not behind it, you know? And also, I mean, he still did it regardless of anything.

Q. Well, he did it *with your consent;* correct?

A. *Yeah.*

Q. And what makes you think that Mr. Denson might be behind that?

A. *I don't know.*

Q. Mr. Denson called a halt to it before you did, didn't he?

A. Yes.

Q. There are no additional facts of which you are aware that might lead you to believe that Mr. Denson might have been behind this phone call?

A. *No.*

Doc. # 25 at 146–47 (emphasis added). Plaintiff was questioned further:

Q. Do you blame yourself for what happened?

A. No.

Q. Do you blame [Denson] for what happened?

A. Somewhat.

Q. And why is that?

A. Like I said before, he still did it. *He was in authority.* I wasn't, you know?

Q. He was in authority by virtue of being your boss?

A. Yes, ma'am.

Doc. # 25 at 157–58 (emphasis added).[11] Fogal also sues CRMI on *respondeat superior* grounds. Doc. # 1 ¶ 27. Yet:

Q. Was it your understanding that any of this was happening to further the business of Taco Bell?

A. No.

*Id.* at 158; *see also id.* at 182 (nor does she have any reason to believe that any other CRMI employee "was in any way involved in the hoax").

### III. *ANALYSIS*

Fogal seeks recovery from CRMI for violating, through Denson, Title VII of the Civil Rights Act of 1964, U.S.C. §§ 2000(e) *et seq.* Doc. # 1 (Count One). She also seeks to recover against both CRMI and Denson for: False Arrest (Count Two); False Imprisonment (Count Three); Assault and Battery (Count Four); Sexual Battery (Count Five); "State Law Sexual Harassment" (Count Six); Invasion of Privacy (Count Seven); Intentional Infliction

§ 16:3 (Sep.2003). In any event, they are not critical to the disposition of this case but provide background color *helpful* to plaintiff in the sense that others have fallen—just as hard—for this hoax.

Relatedly, the Court rejects plaintiff's proffered deposition errata sheet, doc. # 45 (attached) because it does not comply with F.R.Civ.P. 30(e). It was not appended to the deposition by a certifying officer; indeed, it is not even dated to show whether it was com-

pleted within the time Rule 30(e) provides. *Compare* doc. # 40 (Denson's attached notarized, certified errata sheets).

11. Yet, she was asked:

Q. Was there ever anything in any of the conversation that [Denson] said or did that led you to believe he was somehow in cahoots with the man on the phone?
A. No—I mean, no.
Doc. # 25 at 130.

of Emotional Distress (Count Eight) and punitive damages. *Id.* at 13.

■ The Court has extensively quoted from Fogal's testimony to apply Rule 56's command that all reasonable factual inferences be drawn in her favor (since she is the non-moving party). *Nova Infor. Sys., Inc. v. Greenwich Ins. Co.,* 365 F.3d 996, 1002–03 (11th Cir.2004). That testimony shows that Fogal, who does not claim mental or age-based incapacity (but instead an astounding level of naivete/gullibility, doc. # 41 at 1–2), is not entitled to recover on any of her State law claims. O.C.G.A. § 51–11–2 provides that

> [a]s a general rule no tort can be committed against a person *consenting thereto* if that consent is free, is not obtained by fraud, and is the action of a sound mind. The consent of a person incapable of consenting, such as a minor, may not affect the rights of any other person having a right of action for the injury.

(Emphasis added); *see also* GA. LAW OF TORTS § 2–2 (2003 ed.) ("Consent has been defined as voluntarily yielding the will to the proposition of another; acquiescence or compliance therewith, as in nonsexual physical contact with a physician initiated by a patient. Although a written consent is not required in all cases, the absence of a valid informed consent document may give rise to a jury question on the issue of battery, as will evidence of fraud in obtaining the informed consent") (footnotes omitted).

No evidence shows that Denson intentionally thwarted Fogal's capacity to consent to what she now complains. Her own testimony shows that the *prankster* (not Denson) did so via intimidation tactics which included exploitation of Denson's equally astounding gullibility.[12]

To that end, Fogal repeatedly testified that she did not believe Denson was in any way in on the hoax, nor enjoyed or otherwise exploited it. Indeed, she admits that she voluntarily stripped, remained bent over for repeated "butt-smacks," was not prevented from saying "no" or leaving, and even sat naked on Denson's knee and *asked him* if she could "French kiss" him. She admits that all of her compulsion to comply was a function of the prankster's tactics and not anything Denson did or said. Her after-the-fact claim that he is in some way responsible rests on sheer assumption (hence, inadmissible speculation) and the mere fact that he was her supervisor, notwithstanding her admission that she believed he, too, was duped and otherwise was not acting to advance CRMI's business interest (hence, not acting within the scope of his employment).

Thus, even assuming "sexual battery" is a civil tort in Georgia, *see McNamee v. A.J.W.,* 238 Ga.App. 534, 537, 519 S.E.2d 298 (1999), and that emotional distress claims can be supported by sexual harassment evidence, *H.J. Russell & Co. v. Jones,* 250 Ga.App. 28, 31, 550 S.E.2d 450 (2001), no rational jury could find that Fogal did not consent here,[13] or that Denson in any way obtained her consent by fraud within the meaning of O.C.G.A. § 51–11–2. Nor is there sufficient evidence to show that Denson acted willfully.

---

12. Denson, too, is a Georgia Southern University graduate. Doc. # 40 at 4, 21 (bachelor's degree in "general studies"). He was born on 12/30/72. *Id.* at 6.

13. *See also Harris v. Leader,* 231 Ga.App. 709, 709–10, 499 S.E.2d 374 (1998) (No civil "battery" arose from limited, non-sexual contact between plaintiff patient and defendant psychiatrist during course of therapy sessions; not only did patient authorize such contact as part of her treatment, but she in fact initiated it on all but one occasion, and there was no evidence that she ever revoked her consent).

*Compare Vasquez v. Smith,* 259 Ga.App. 79, 80–82, 576 S.E.2d 59 (2003) (recounting co-worker's repeated *intentional* battering of plaintiff).

Put another way, Georgia law simply does not protect college-educated, yet amazingly gullible individuals from themselves. *See, e.g., Muldovan v. McEachern,* 271 Ga. 805, 809–10, 523 S.E.2d 566 (1999) (shooting victim, who died from his injuries, assumed the risk of suffering whatever harm he might sustain when shooter fired gun at victim, and thus action against shooter for willful or wanton misconduct was barred; victim knew that gun was loaded, victim handed gun to shooter during game of "Russian Roulette," shooter pointed gun at victim and fired but gun did not discharge, victim then told shooter to pull the trigger a second time, and fatal bullet was then fired). Fogal's consent neutralizes all of her state law tort claims.

 Nor can she cite to the basic evidentiary minimum to support a Title VII-based, sexual harassment claim against CRMI. *See Walton v. Johnson & Johnson Servs., Inc.,* 347 F.3d 1272, 1284 (11th Cir. 2003) (for sexual harassment to rise to level where it alters terms and conditions of employment, as required to be actionable as hostile work environment under Title VII, work environment must be both *objectively and subjectively* offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so); *Joens v. John Morrell & Co.,* 354 F.3d 938, 939 (8th Cir.2004) (to establish a hostile work environment claim under Title VII, an employee must show subjection to *unwelcome* sex-based harassment that was sufficiently severe or pervasive to alter a term, condition, or privilege of employment); *Breda v. Wolf Camera, Inc.,* 148 F.Supp.2d 1371, 1374 (S.D.Ga.2001) ("A single incident typically will not be enough"). Objectively and

subjectively speaking, Fogal found the *prankster's* conduct unwelcome, offensive and abusive, *not* Denson's.

For that matter, plaintiff has failed to show that Denson did what he did *because* of her sex (*males* were subjected to essentially the same hoax at another restaurant that night), much less that she "unwelcomed" the massaging, spanking, kissing (etc.) from *him,* as opposed to the prankster. At most she proffers an after-the-fact, conclusory characterization directly contradicting her deposition admission that she did not believe Denson to be a willing participant in the hoax, and that she herself kissed Denson while naked on his lap, voluntarily submitted to his spanking, (etc.), to avoid *arrest* as threatened by the prankster (as opposed any intentionally sexually harassing conduct by Denson).

In light of this result, the Court need not reach defendants' remaining defenses (*e.g.,* that Fogal's claims are barred by her worker's compensation remedy, etc.).

It is worth noting, however, that parents and educators (in this case, extending all the way through a Georgia high school and university education cycle) simply must do a better job in educating our young, and that includes, as this case so painfully demonstrates, inculcating a healthy dose of "street smarts" into them. It is simply appalling that a university student did not even know what the word "leer" means, could be led to believe that civilian store managers can legally strip-search employees (something not even *jailers* can do absent reasonable suspicion, *see Wilson v. Jones,* 251 F.3d 1340, 1343 (11th Cir. 2001)), and could further be led into patently nonsensical conduct (*e.g.,* "buttsmacking" and French kissing, while naked, in a search for a "hidden" change purse).

In that regard, the damage caused by the nasty hoax played here was *compounded* by the lawyer who chose to bring this otherwise baseless lawsuit.[14] That this young woman was humiliated is without question. That such has been super-illuminated in a public proceeding (one in which she was forced to relive the experience in an extensive deposition) constitutes a failure of good judgment.[15]

## IV. CONCLUSION

Accordingly, the Court **GRANTS** summary judgment to defendants Coastal Restaurant Management, Inc. and Morgan Shane Denson. Doc. ## 26, 31. Their amendment motions (doc. ## 73–74) are **DENIED** as moot. Finally, plaintiff's Complaint is **DISMISSED WITH PREJUDICE.**

---

14. Fogal says her parents encouraged her to sue. Doc. # 25 at 164. A lawyer, however, signed his name to it.

15. Tragi-comically, Fogal's counsel literally plays up her naivete for litigational advantage: "Perhaps because of her background, [she] was an 'amazingly innocent young woman' at the time the incident occurred. It was important to Miss Fogal to be 'good'. . . . [She] also had a tremendous respect for authority. . . . Unfortunately, these very qualities allowed [her] to be victimized by Defendant Denson." Doc. # 41 at 1–2 (cites omitted). Courts should not be used to propagate a culture of victimology/entitlement that degrades the very sense of individual responsibility and hard work on which this great nation was founded. The best lessons learned are usually the most expensive. At tremendous expense, plaintiff hopefully will have learned to think for herself.